[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 15-13395

————————————————

D.C. Docket No. 9:13-cr-80054-KAM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONTAVIOUS M. BLAKE,
TARA JO MOORE,

Defendants-Appellants.

————————————————

Appeals from the United States District Court
for the Southern District of Florida

————————————————

(August 21, 2017)

Before ED CARNES, Chief Judge, FAY, and PARKER,[*] Circuit Judges.

ED CARNES, Chief Judge:

After a nine-day trial, a jury found Dontavious Blake and Tara Jo Moore guilty of child sex trafficking for managing a prostitution ring involving at least two girls under the age of eighteen.  Blake and Moore challenge numerous rulings the district court made before and during trial, and at sentencing.

## I. FACTUAL BACKGROUND

### A. Pre-Trial

Blake and Moore had a system for running their prostitution ring.  One of them would post ads for prostitution services on the classifieds website Backpage.  Moore would then take phone calls from potential customers who were responding to the ads.  And Blake would give the prostitutes rides to their appointments and provide muscle.  The money was split 50/50 between the working prostitute on the one hand and Blake and Moore on the other.

Through a variety of leads, the FBI discovered Blake and Moore's prostitution ring.  It learned that the Backpage ads had been posted using an email address (hereafter the "S.B. email address"), which the FBI determined belonged to Moore.  And it found out that at least two girls, known as T.H. and E.P., had

---

[*] Honorable Barrington D. Parker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

been under the age of eighteen when they engaged in prostitution for Blake and Moore.

In the wake of those discoveries, the FBI arrested Blake and Moore.  It continued the investigation, executing four post-arrest search warrants relevant to this appeal.  First, it executed a warrant to seize and search electronics in Blake and Moore's townhouse, including an "Apple iPad tablet[ ]."  Once in possession of that iPad tablet, however, the FBI found itself unable to access any of the device's data due to its security features.  So the FBI requested and received a district court order, issued under the All Writs Act, 28 U.S.C. § 1651(a), requiring the iPad's manufacturer, Apple Inc., to assist the FBI in bypassing the iPad's passcode lock and other security measures.  With Apple's help, the FBI was able to successfully unlock the device and download its data.

The second relevant search warrant the FBI executed directed Microsoft, which owns Hotmail, to turn over emails from two of Blake and Moore's email accounts, including the S.B. email account.  The Microsoft warrant did not seek all emails in those two email accounts; instead, it was limited to certain categories of emails in them that were linked to the sex trafficking charges against Blake and Moore.  For example, the warrant required Microsoft to turn over all "[e]mails, correspondence, and contact information for Backpage.com" and all "[e]mails and

3

correspondence from online adult services websites" that were contained within the two email accounts.

Finally, the FBI also applied for and received two almost identical search warrants for Moore's Facebook account. Because that account was associated with the S.B. email address and Moore's phone number, the FBI knew it belonged to her. At the time it executed the Facebook warrants, the FBI had extensive evidence linking Moore to the prostitution ring, including statements by T.H. inculpating her. And Moore's Facebook account was suggestive of criminal conduct: the publicly viewable version of the account listed Moore's occupation as "Boss Lady" at "Tricks R [U]s."

The two warrants required Facebook to "disclose" to the government virtually every type of data that could be located in a Facebook account, including every private instant message Moore had ever sent or received, every IP address she had ever logged in from,[1] every photograph she had ever uploaded or been "tagged" in, every private or public group she had ever been a member of, every search on the website she had ever conducted, and every purchase she had ever made through "Facebook Marketplace," as well as her entire contact list. The disclosures were not limited to data from the period of time during which Moore managed the prostitution ring; one warrant asked for all data "from the period of

---

[1] Law enforcement officials can generally use an IP address to determine the physical location from which an individual logged into Facebook.

the creation of the account" and the other did not specify what period of time was requested. The warrants did state that the only information that would be "seized," after all that data had been "disclosed" to the FBI, was data that "constitute[d] fruits, evidence and instrumentalities" of a specified crime.

After the execution of those four warrants, a third superseding indictment charged Blake and Moore with six violations of 18 U.S.C. § 1591: substantive child sex trafficking of T.H. (Count 1); substantive child sex trafficking of E.P. (Count 2); conspiracy to sex traffic children — T.H. and E.P. (Count 3); two substantive counts of sex trafficking adults by coercion (Counts 4 and 5); and one count of conspiracy to sex traffic by coercion (Count 6).

Blake and Moore filed several pre-trial motions relevant to this appeal. Moore moved to sever Counts 1 through 3, which involved sex trafficking of children, from Counts 4 through 6, which involved sex trafficking of adults by coercion. Blake and Moore moved to suppress evidence obtained from the iPad. And they moved to suppress all the evidence gathered as a result of the search warrants served on Microsoft and Facebook. The district court denied all of those motions.

## B. Trial and Sentencing

At trial T.H. testified about her time prostituting for Blake and Moore, starting when she was sixteen years old. To explain why she turned to prostitution,

5

T.H. described her difficult upbringing.  She explained that her great uncle had sexually abused her when she was between the ages of five and eight.  During that same period, her parents separated, her father left her life, and her mother fell into a deep depression, leaving T.H.'s older sister to raise her.  That older sister was a drug addict who physically abused her.

E.P. testified as well.  She stated that she called Blake after she found his business card and started prostituting for him soon thereafter.  She was sixteen when she started — young enough that Blake had to buy her cigarettes.  On cross examination she admitted that she saw Moore only six times "at most."  One of those times was when Moore spent about twenty minutes taking pictures of her for a Backpage ad.

The government also called Khrystyna Trejo, an adult prostitute who had spent time working alongside T.H. and E.P.  She testified that, although E.P. had told her that she was eighteen, E.P.'s way of "approach[ing] certain things" and her interest in children's television shows made her seem "younger than what . . . she said she was."

In addition to testimony related solely to the child sex trafficking charges, the government called several witnesses in an attempt to prove its theory that Blake and Moore "coerced" adult prostitutes by controlling their drug supply, evidence that went to Counts 4 through 6.  Several adult prostitutes testified both to the

6

general structure of the prostitution ring and the fact that almost all the money the prostitutes made was immediately spent buying drugs from Blake. The government also called an addiction expert who testified about the physical and neurological characteristics of drug dependency and withdrawal.

At the close of the government's case in chief, the district court granted Blake and Moore's motion for a judgment of acquittal on the adult sex trafficking by coercion charges (Counts 4 through 6), after finding that the government had not proven the "coercion" element of the offense. The court instructed the jury not to "draw any conclusions or inferences one way or the other because [Counts 4 through 6] are no longer involved in the case."

Blake and Moore did not present any evidence of their own. The jury found them guilty of the remaining charges — two substantive counts of child sex trafficking and one count of conspiracy to sex traffic children, and the district court entered judgment of conviction on those counts.

After applying a number of enhancements, the district court sentenced Blake to 324 months imprisonment, followed by supervised release for a term of life. And it sentenced Moore to 180 months imprisonment followed by 240 months supervised release.

7

## II. ANALYSIS

### A.    Severance of Charges

Blake and Moore first challenge the district court's denial of their motion to sever the child sex trafficking charges from the sex trafficking by coercion charges. We review the denial of a motion to sever charges only for an abuse of discretion. United States v. Barsoum, 763 F.3d 1321, 1336 (11th Cir. 2014). We will not reverse the district court's decision unless Blake and Moore "demonstrate that [they] received an unfair trial and suffered compelling prejudice." United States v. Slaughter, 708 F.3d 1208, 1213 (11th Cir. 2013) (quotation marks omitted).

That is a "heavy" burden, id., and Blake and Moore have not carried it. First of all, a significant part of the testimony underlying the sex trafficking by coercion charges was also relevant to the child sex trafficking charges. For example, in closing arguments Blake's counsel argued that the only T.H. Backpage ad presented at trial was posted under the category of "body rubs" (as opposed to under the "escorts" category), indicating that T.H. had not engaged in prostitution. But given the testimony of some of the adult prostitutes that Blake and Moore generally used Backpage to advertise prostitution, the jury could have inferred that the T.H. ad was actually for commercial sex acts, whatever category it was posted under. Similarly, the testimony of the adult prostitutes that Moore handled interactions with customers undermined her argument that she was not a co-

manager of the conspiracy. Because much of the evidence presented in connection with the sex trafficking by coercion charges could have been and likely would have been presented even if the trial had involved only the child sex trafficking charges, Blake and Moore did not suffer "compelling prejudice" from having the charges tried together.[2]

Blake and Moore argue that, even if the evidence was generally relevant to both sets of charges, the inflammatory nature of the sex trafficking by coercion charges resulted in compelling prejudice. We disagree. Sex trafficking by coercion is an abhorrent crime, but so is child sex trafficking. And there is no compelling prejudice where both sets of charges are inflammatory. See United States v. Hersh, 297 F.3d 1233, 1243 (11th Cir. 2002) (holding that there was no compelling prejudice where "a reasonable jury undoubtedly would have found both the evidence of [the defendant's] child molestation and the evidence of [his] child pornography very inflammatory"). The district court's denial of Blake and Moore's motion to sever was not an abuse of discretion.

## B. The Bypass Order

Blake and Moore next contend that the order requiring Apple to assist in bypassing the iPad's security features — what we will call the "bypass order" —

---

[2] The government concedes that the addiction expert's testimony may not have been relevant to the child sex trafficking charges. That testimony, however, did not cause compelling prejudice and did not make Blake and Moore's trial "unfair." See Slaughter, 708 F.3d at 1213.

exceeded the authority granted by the All Writs Act. As a threshold matter, we must address whether Blake and Moore have standing to make this challenge. They satisfy the three requirements of constitutional standing because they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct . . . and (3) that is likely to be redressed by a favorable judicial decision." Spokeo v. Robins, 578 U.S. __, 136 S. Ct. 1540, 1547 (2016). Specifically, they were injured because the evidence gathered as a result of the bypass order was used to convict them. That injury is fairly traceable to the government's request for and the district court's issuance of the bypass order. And if a court ruled in their favor on the All Writs Act issue, and if a court further ruled that suppression was the proper remedy for the violation of the All Writs Act, Blake and Moore's injury would be redressed.[3]

In addition to the three constitutional standing requirements, "the Supreme Court has held that prudential requirements pose additional limitations on standing." Wolff v. Cash 4 Titles, 351 F.3d 1348, 1353 (11th Cir. 2003). One of those prudential limitations is the rule that a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or

---

[3] It is an open question whether suppression would have been the proper remedy if the district court had found that the bypass order violated the All Writs Act. But as long as a litigant has a nonfrivolous claim that a requested remedy could be awarded by the court, he has satisfied the redressability prong of constitutional standing if that remedy would redress his injury. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 108 n.9, 118 S. Ct. 1003, 1019 n.9 (1998). Whether or not they would ultimately be entitled to suppression, Blake and Moore's request for that remedy if they prevail is not frivolous.

10

interests of third parties." Warth v. Seldin, 422 U.S. 490, 499, 95 S. Ct. 2197, 2205 (1975); see also Craig v. Boren, 429 U.S. 190, 193, 97 S. Ct. 451, 455 (1976) (explaining that the limitation on asserting third parties' rights is not "constitutionally mandated" but instead "stem[s] from a salutary rule of self-restraint") (quotation marks omitted).  Here, Blake and Moore are attempting to invoke All Writs Act protections, such as its restriction that any burden imposed on a third party not be "unreasonable," that shield third parties like Apple, not criminal defendants.  See United States v. N.Y. Tel. Co., 434 U.S. 159, 171, 98 S. Ct. 364, 372 (1977).  In other words, they are attempting to assert Apple's legal rights, not their own.[4]

There are exceptions to the rule that a litigant can't assert a third party's rights, see, e.g., Craig, 429 U.S. at 192–94, 97 S. Ct. at 454–55 (holding that a beer

---

[4] The government couches its argument on this point in terms of "Fourth Amendment standing," a similar but analytically distinct limitation that applies only when a defendant is challenging a search or seizure on Fourth Amendment grounds.  See Rakas v. Illinois, 439 U.S. 128, 139, 99 S. Ct. 421, 428 (1978) (explaining that Fourth Amendment standing is part of substantive Fourth Amendment law and is "separate" from the more general concept of standing).  To the extent that Fourth Amendment standing applies to Blake and Moore's All Writs Act challenge, they do have it.  In order to have the standing required to claim protection of the Fourth Amendment, "the person invoking the protection must have an objectively reasonable expectation of privacy in the place searched or item seized." Rehberg v. Paulk, 611 F.3d 828, 842 (11th Cir. 2010).  Blake and Moore had a reasonable expectation of privacy in the password-locked iPad, which was owned by one of them, used by one or both of them, and kept inside the house they both lived in.  See, e.g., United States v. Heckenkamp, 482 F.3d 1142, 1146 (9th Cir. 2007) (holding that a college student had a reasonable expectation of privacy in his dorm room computer); United States v. Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004) ("Individuals generally possess a reasonable expectation of privacy in their home computers."); Guest v. Leis, 255 F.3d 325, 333 (6th Cir. 2001) ("Home owners would of course have a reasonable expectation of privacy in their homes and in their belongings — including computers — inside the home.").

11

vendor had third-party standing to assert the equal protection rights of beer buyers), and whether there is an exception that would allow Blake and Moore to assert Apple's rights is a thorny question. But "because prudential standing is flexible and not jurisdictional in nature," and deciding that issue will not affect the result in this case, we can bypass it and reach the less difficult issue of whether the bypass order violated the requirements of the All Writs Act. See Am. Iron & Steel Inst. v. OSHA, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999). Our decision to move straight to the merits of Blake and Moore's claim does not imply any view about whether they could meet the prudential standing requirements for challenging the All Writs Act order.

On the merits, Blake and Moore contend that the district court did not have the authority to issue the bypass order, and, as a result, it should have suppressed any evidence resulting from Apple's compliance with that order.[5] We review de novo the basic premise of that contention, which is that the order exceeded the court's authority under the All Writs Act. See Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004) (holding that the construction of a statute is a question of law that we review de novo); United States v. Perry, 360

---

[5] As we have mentioned, it is not settled whether suppression would have been the proper remedy if the district court had ruled that its authority under the All Writs Act had been exceeded. In view of our decision that the order was proper, we need not decide what, if any, remedy would have been appropriate if it had not been.

F.3d 519, 533 (6th Cir. 2004) ("Appellate courts review a district court's assertion of jurisdiction under the All Writs Act de novo.").

The All Writs Act provides in full:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651(a). The Supreme Court has recognized five requirements that must be met before a court can compel under the All Writs Act the assistance of a third party in a criminal investigation: (1) the order must be necessary or appropriate to effectuate a previously issued order, (2) it must not be covered by another statute, (3) it must not be inconsistent with the intent of Congress, (4) the third party must not be too far removed from the underlying case, and (5) the burden imposed on the third party must not be unreasonable. See United States v. N.Y. Tel. Co., 434 U.S. 159, 172–78, 98 S. Ct. 364, 372–75 (1977).

### 1. Necessary or Appropriate

The first requirement for use of the All Writs Act is that the use be necessary or appropriate to carry out an issued order. See id. at 172, 98 S. Ct. at 372 ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued . . . ."). The bypass order in this case was necessary or appropriate because there was no other

13

way for the FBI to execute the district court's order to search the contents of the iPad.  See In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011, 670 F.3d 1335, 1346–49 (11th Cir. 2012) (holding that compelling a defendant to produce data protected by his password without providing constitutionally sufficient immunity violates the Fifth Amendment).

### 2. Not Otherwise Covered by Statute

The authority granted by the All Writs Act is broad but not boundless.  The Act "is a residual source of authority" that permits issuing writs only if they "are not otherwise covered by statute."  Penn. Bureau of Corr. v. U.S. Marshals Serv., 474 U.S. 34, 43, 106 S. Ct. 355, 361 (1985).  It is a gap filler.  "Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling."  Id.  And where Congress has proscribed a certain type of judicial action, the Act cannot overcome that proscription.  See id.  The bypass order meets this requirement because no statute expressly permits or prohibits it.

### 3. Not Inconsistent with Intent of Congress

Even where, as here, no statute expressly permits or prohibits a particular judicial action, the court cannot always use the Act to fill the gap.  Any order issued under the All Writs Act must still be "consistent with the intent of Congress."  See N.Y. Tel., 434 U.S. at 172, 98 S. Ct. at 372.  To determine if a

14

judicial action is consistent with congressional intent, it is not enough to ask whether there is an on-point statute. We must also look at laws that are not directly on point but that speak to similar issues in order to determine whether the proposed judicial action is in line with congressional intent. See id. 172, 176–78, 98 S. Ct. at 372, 374–75. If the legislative context bearing on the proposed action suggests that Congress did not intend for the court to have a given power, taking the action under the All Writs Act is inconsistent with congressional intent and cannot be the basis for the action. See id.

The Supreme Court's decision in New York Telephone illustrates this principle. In that case the district court had issued an order under the All Writs Act requiring a phone company to assist the FBI in installing pen registers on certain phone lines. Id. at 161–62, 98 S. Ct. at 367. The Supreme Court held the order was consistent with congressional intent for two reasons. Id. at 176–78, 98 S. Ct. at 374–75. First, the legislative history of Title III of the Omnibus Crime Control and Safe Streets Act, which governs the issuance of wiretaps, makes clear that Congress intended for courts to be able to order the installation of pen registers. See id. at 176–77, 98 S. Ct. at 374. Second, amendments to Title III had authorized courts to compel assistance in installing wiretaps, though they did not specifically mention pen registers. Id. at 176–77, 98 S. Ct. at 374–75. The Court reasoned that Congress likewise intended for courts to be able to compel assistance

15

in installing pen registers when assistance was necessary.  Id. at 177–78, 98 S. Ct. at 374–75.  As a result, the Court held that the district court's order was within the authority granted by the All Writs Act.  Id. at 177–78, 98 S. Ct. at 375.

Blake and Moore argue that the New York Telephone case is distinguishable because, unlike the pen register order involved in that case, the issuance of the bypass order in this case is contrary to congressional intent.  They rely on the Communications Assistance for Law Enforcement Act (CALEA), 47 U.S.C. §§ 1001–1010, for that proposition.  Section 1002, which is part of CALEA, requires "telecommunications carrier[s]" to provide certain forms of assistance to law enforcement, while exempting "information services" companies — a category that includes Apple — from those same requirements.[6]  See id. §§ 1001(6), 1002(a), (b)(2).  Blake and Moore assert that the "information services" exemption in § 1002 shows that Congress intends for companies like Apple to be insulated from court-ordered law enforcement cooperation through bypass orders.

The problem is that the § 1002 requirements are all about design choices and ensuring that telephone networks "are capable of" delivering evidence to law enforcement.  See id. § 1002(a).  If this case were about a court order forcing Apple to initially design its devices so that law enforcement would be capable of accessing them in the future, § 1002's exemption of information services

---

[6] CALEA defines "telecommunications carrier[s]" as common carrier phone companies such as AT&T.  See id. § 1001(8)(A).

companies would be relevant.  But that is not what this case is about.  It is, instead, about a device that has already been designed, manufactured, sold, and used, and about how to access the information on that device.  In light of the distinction between initial design and later access, § 1002 does not show that bypass orders are inconsistent with congressional intent.

### 4. Third Party Not Too Far Removed from Underlying Case

The fourth requirement for use of the All Writs Act, at least for compelling a non-party in a criminal case, is that the non-party not be "so far removed from the underlying controversy that its assistance could not be permissibly compelled." N.Y. Tel., 434 U.S. at 174, 98 S. Ct. at 373.  Blake and Moore argue that "Apple's connection to the case [is] merely that it . . . originally manufactured the iPad," so it is too far removed for its assistance to be compelled.  That argument misstates the technology.  Apple continued being connected to Blake and Moore's use of the iPad even after they bought it:  the iPad ran on an operating system owned by Apple (Blake and Moore were only licensing it); Apple servers conveyed messages sent from the iPad; and Apple servers backed up the iPad's data.  See Apple, Inc., Apple iOS Software License Agreement 1 (2016), http://apple.co/2nl946W; Greg Kumparak, Apple Explains Exactly How Secure iMessage Really Is, TechCrunch (Feb. 27, 2014), http://tcrn.ch/2kNxy3q.  Apple's continued connection to the case

means that it was not so far removed from the underlying controversy that its assistance could not be compelled.

### 5. Not Unreasonable Burden on Third Party

The final New York Telephone requirement is that any burden imposed on the compelled party must not be "unreasonable." N.Y. Tel., 434 U.S. at 172, 98 S. Ct. at 372. To comply with the bypass order, Apple simply had to have an employee plug the iPad into a special computer and then transfer the iPad's data to a thumb drive. That is not an unreasonable burden, especially in light of the fact that Apple did not object to the bypass order's requirements.

### 6. Summary

The bypass order was necessary or appropriate to carry out the search warrant the district court had issued, the assistance sought was not specifically addressed by another statute, the bypass order was not inconsistent with Congress' intent, Apple was not too far removed from the underlying controversy, and the burden the order imposed on it was not unreasonable. See id. at 172–74, 98 S. Ct. at 372–73. It follows that the bypass order did not exceed the district court's authority and the evidence gathered as a result of that order did not have to be suppressed.

18

### C. The Microsoft and Facebook Searches

Moore also contends that the district court erred in not excluding evidence gathered as a result of the FBI's search of her email and Facebook accounts because the search warrants were flawed. "We review a district court's denial of a defendant's motion to suppress evidence as a mixed question of law and fact. We review only for clear error the court's findings of fact, but we review de novo the court's application of the law to those facts." United States v. Noriega, 676 F.3d 1252, 1259 (11th Cir. 2012) (citation omitted).

Moore argues that the search warrants were flawed in two ways. First, she asserts that the government lacked probable cause to search her Facebook account. That assertion is meritless. By the time the FBI applied for the Facebook warrants, it had collected a wealth of evidence, which was set out in the affidavits supporting the warrants, showing that she was part of the prostitution conspiracy. Moore's argument that there was no probable cause to believe that evidence of her participation would be found in her Facebook account is refuted by the fact that in it she listed her occupation as "Boss Lady" at "Tricks R [U]s," thereby linking her Facebook account to the conspiracy.

Second, Moore asserts that the Microsoft warrant and the Facebook warrants were so broad that they violated the Fourth Amendment's particularity requirement. The Fourth Amendment requires that "those searches deemed

19

necessary should be as limited as possible." <u>Coolidge v. New Hampshire</u>, 403

U.S. 443, 467, 91 S. Ct. 2022, 2038 (1971).  The "specific evil" that limitation

targets "is not that of intrusion per se, but of a general, exploratory rummaging in a

person's belongings."  <u>Id.</u>  That type of rummaging was permitted during the

colonial era by the "general warrant," an instrument "abhorred by the colonists."

<u>Id.</u>  The Fourth Amendment is intended to preclude "general warrants" by

"requiring a 'particular description' of the things to be seized."  <u>Id.</u> at 467, 91 S.

Ct. at 2038–39.

Viewed against that constitutional history, the Microsoft warrant complied

with the particularity requirement.  It limited the emails to be turned over to the

government, ensuring that only those that had the potential to contain incriminating

evidence would be disclosed.  Those limitations prevented "a general, exploratory

rummaging" through Moore's email correspondence.  The Microsoft warrant was

okay.[7]

The Facebook warrants are another matter.  They required disclosure to the

government of virtually every kind of data that could be found in a social media

account.  <u>See</u> p. 4, above.  And unnecessarily so.  With respect to private instant

---

[7] It is somewhat troubling that the Microsoft warrant did not limit the emails sought to emails sent or received within the time period of Moore's suspected participation in the conspiracy.  Nevertheless, the warrant was appropriately limited in scope because it sought only discrete categories of emails that were connected to the alleged crimes.  As a result, the lack of a time limitation did not render the warrant unconstitutional.

20

messages, for example, the warrants could have limited the request to messages sent to or from persons suspected at that time of being prostitutes or customers. And the warrants should have requested data only from the period of time during which Moore was suspected of taking part in the prostitution conspiracy. Disclosures consistent with those limitations might then have provided probable cause for a broader, although still targeted, search of Moore's Facebook account. That procedure would have undermined any claim that the Facebook warrants were the internet-era version of a "general warrant." See Coolidge, 403 U.S. at 467, 91 S. Ct. at 2038; cf. Riley v. California, 573 U.S. __, 134 S. Ct. 2473, 2488–91 (2014) ("The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions . . . .").

We are not convinced that the cases the government relies on, which involve seizing an entire hard drive located in the defendant's home and then later searching it at the government's offices, are applicable in the social media account context. See, e.g., United States v. Evers, 669 F.3d 645, 652 (6th Cir. 2012); United States v. Stabile, 633 F.3d 219, 234 (3d Cir. 2011). The means of hiding evidence on a hard drive — obscure folders, misnamed files, encrypted data — are not currently possible in the context of a Facebook account. Hard drive searches require time-consuming electronic forensic investigation with special equipment, and conducting that kind of search in the defendant's home would be impractical,

if not impossible.  By contrast, when it comes to Facebook account searches, the government need only send a request with the specific data sought and Facebook will respond with precisely that data.  See generally Information for Law Enforcement Authorities, Facebook, http://bit.ly/QkrAHX (last visited July 27, 2017).  That procedure does not appear to be impractical for Facebook or for the government. Facebook produced data in response to over 9500 search warrants in the six-month period between July and December 2015.  United States Law Enforcement Requests for Data, Facebook, http://bit.ly/2aICDHg (last visited July 27, 2017).

That said, we need not decide whether the Facebook warrants violated the Fourth Amendment because, even if they did, the district court did not err in allowing the government to use evidence gathered as a result of them.  The Facebook warrants fall into the "good-faith exception" to the exclusionary rule established by United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984).  See United States v. Herring, 492 F.3d 1212, 1215 (11th Cir. 2007) ("[W]hether to apply the exclusionary rule is an issue separate from the question [of] whether the Fourth Amendment . . . [was] violated by police conduct.") (quotation marks omitted), aff'd, 555 U.S. 135, 129 S. Ct. 695 (2009).

In Leon the Supreme Court held that "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" should generally

22

not be excluded.  468 U.S. at 922, 104 S. Ct. at 3420.  The Court noted two circumstances that could justify exclusion in a case like this one:  (1) if the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" or (2) if the warrant was "so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers c[ould not have] reasonably presume[d] it to be valid."  Id. at 923, 104 S. Ct. at 3421.

The Facebook warrants do not fall within either category of excludable warrants.  As we have already explained, probable cause supported issuance of the warrants.  And while the warrants may have violated the particularity requirement, whether they did is not an open and shut matter; it is a close enough question that the warrants were not "so facially deficient" that the FBI agents who executed them could not have reasonably believed them to be valid.  As a result, we affirm the district court's decision not to suppress the evidence gathered as a result of Microsoft warrant and the Facebook warrants.

## D. Trial Issues

Moore raises two issues with respect to her trial.

### 1. T.H.'s Testimony About Her Upbringing

Moore first contends that the district court should not have permitted T.H. to testify about her difficult childhood, which are events that occurred before T.H.

23

joined the prostitution ring.  Moore argues that testimony was not relevant under Federal Rule of Evidence 401, or if it was relevant, that it was inadmissible under Federal Rule of Evidence 403 because its probative value was substantially outweighed by its danger of unfair prejudice.  "We review evidentiary rulings for abuse of discretion."  United States v. Wilk, 572 F.3d 1229, 1234 (11th Cir. 2009).  There was none.

T.H.'s statements about her upbringing were relevant under Rule 401 because they tended to make the fact that she ran away from home to prostitute herself more probable.  See Fed. R. Evid. 401 (providing that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence").  And her testimony was not so inflammatory that the "extraordinary remedy" of Rule 403 exclusion was appropriate.  See United States v. Alfaro-Moncada, 607 F.3d 720, 732 (11th Cir. 2010).

Moore relies on United States v. Hands, 184 F.3d 1322 (11th Cir. 1999), in which we stated that the district court should have excluded testimony about the defendant's history of abusing his partner.  Id. at 1328.  But there the challenged testimony was that the defendant was the abuser, creating a risk that the jury may have convicted him for abusing his partner, not for the unrelated crime he had been charged with.  See id. at 1328–29.  By contrast, it was clear that Blake and Moore

24

did not inflict the abuse T.H. suffered at home.  There was no unfair prejudice, and Rule 403 exclusion was not necessary.

## 2. Sufficiency of Evidence as to Count 2

Moore also contends that the government presented insufficient evidence to sustain her conviction on Count 2, which was the substantive charge that she sex trafficked E.P., because the evidence did not establish that she interacted with E.P. enough to satisfy the knowledge element of 18 U.S.C. § 1591(a).  "[W]e review the sufficiency of evidence de novo, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict."  United States v. Lumley, 135 F.3d 758, 759 (11th Cir. 1998).

Under 18 U.S.C. § 1591(c), in order to prove knowledge for the purposes of § 1591(a) the government did not need to prove that Moore had actual knowledge that E.P. was underage; it needed to prove only that Moore had a "reasonable opportunity" to observe E.P.  E.P. testified that she came into contact with Moore "at most" six times.  At least one of those encounters involved considerable interaction between the two of them — when Moore spent twenty minutes taking photographs of E.P. for her Backpage ad.  Furthermore, Trejo, an adult prostitute who spent time with E.P., testified that E.P.'s manner of talking and "approach[ing] certain things" made her seem younger "than what she said she

25

was." In light of that, the jury could have reasonably concluded that five or six interactions were "a reasonable opportunity" for Moore to have observed E.P., which, under § 1591(c), satisfied § 1591(a)'s knowledge requirement. There was sufficient evidence to convict her on Count 2.

### E. Sentencing Issues

Blake and Moore also raise several challenges to their sentences. "We review the district court's interpretation and application of the sentencing guidelines de novo and its findings of fact for clear error." United States v. Bane, 720 F.3d 818, 824 (11th Cir. 2013).

### 1. The Calculation of Blake's Sentence

Because the victims were over the age of fourteen but below the age of eighteen, the presentence investigation report noted that Blake's base offense level was 30. See United States Sentencing Guidelines § 2G1.3(a)(2) (Nov. 2014) (citing 18 U.S.C. § 1591(b)(2)). After applying a number of enhancements, the PSR calculated his adjusted offense level as 51, but it was reduced to 43 because that is the maximum offense level permitted by the guidelines. See id. § 5A cmt. n.2. With a criminal history category of IV, the advisory guidelines range was life. See id. § 5A.

Blake made several objections to his PSR, including two that are relevant to his appeal. First, he contended that the PSR should not have applied a two-level

enhancement under U.S.S.G. § 2G1.3(b)(2)(B) because he did not "unduly influence" T.H. and E.P. to engage in "prohibited sexual conduct." Second, he contended that the PSR had erroneously applied a two-level enhancement under § 2G1.3(b)(4), which applies to offenses "involv[ing] the commission of a sex act or sexual conduct."

At the sentence hearing the district court sustained some of Blake's objections but overruled his objections to the § 2G1.3(b)(2)(B) and § 2G1.3(b)(4) enhancements. The result was that Blake's adjusted offense level remained at 43 and his criminal history score stayed at IV, so his advisory guidelines range was still life. The district court then discussed and applied the sentencing factors contained in 18 U.S.C. § 3553(a). It noted that the case was "horrific," that Blake's actions were "despicable," and that his "history and characteristics aren't the most favorable." But it also found that the advisory guidelines range for Blake's crimes of conviction was "excessive." On that basis, the court granted Blake a downward variance, sentencing him to 324 months imprisonment, followed by supervised release for a term of life.

## 2. Blake's Sentencing Issues

Blake contends that the district court erred in applying the two-level § 2G1.3(b)(2)(B) enhancement, which applies where the defendant "unduly influenced a minor to engage in prohibited sexual conduct." See U.S.S.G.

27

§ 2G1.3(b)(2)(B).  Blake argues that because T.H. and E.P. sought him out, he did not "unduly influence[ ]" them; if anything, he says, they influenced him.  As § 2G1.3's commentary shows, however, because Blake was more than ten years older than the victims he had to overcome a presumption that he unduly influenced them.  See id. § 2G1.3 cmt. n.3(B).  He did not overcome that presumption.  In determining whether a defendant used undue influence, courts may consider whether his conduct "displaye[d] an abuse of superior knowledge, influence and resources."  United States v. Root, 296 F.3d 1222, 1234 (11th Cir. 2002), superseded on other grounds by Amend. 732, U.S.S.G. App. C (2009).  Blake abused his superior knowledge and resources by managing the prostitution ring, posting ads on Backpage using his personal electronic devices, and using his car to drive T.H. and E.P. to their prostitution appointments.  Considering the presumption of undue influence and Blake's facilitation of T.H. and E.P.'s prohibited sexual conduct, the district court did not clearly err in finding that Blake unduly influenced T.H. and E.P.

Blake contends that the district court's application of a two-level enhancement under U.S.S.G. § 2G1.3(b)(4)(A) after his base offense level was set by § 2G1.3(a)(2) amounted to impermissible double counting.  "Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully

28

accounted for by application of another part of the Guidelines." United States v. Matos-Rodriguez, 188 F.3d 1300, 1309 (11th Cir. 1999). That did not happen here.

Section 2G1.3(a)(2) sets the base offense level for convictions under 18 U.S.C. § 1591 where the child sex trafficking victims were older than fourteen but younger than eighteen. See 18 U.S.C. § 1591(b)(2). The guideline incorporates the elements of § 1591, which applies where a defendant knows or acts in reckless disregard of the fact that the victim "has not attained the age of 18 years and will be caused to engage in a commercial sex act." Meanwhile, § 2G1.3(b)(4)(A) applies where the offense "involved the commission of a sex act or sexual contact." Blake asserts that an element of § 1591 is that the victim committed a sex act, and for that reason applying both § 2G1.3(a)(2) and the § 2G1.3(b)(4)(A) "commission of a sex act" enhancement double counted engagement in sex acts.

The assertion underlying Blake's argument cannot be squared with our decision in United States v. Mozie, 752 F.3d 1271 (11th Cir. 2014), which held that the commission of a sex act is not an element of § 1591. Id. at 1286–87; see also United States v. Garcia-Gonzalez, 714 F.3d 306, 312 (5th Cir. 2013) ("The future verb tense of the phrase 'will be caused' . . . indicates that a sex act does not have to occur to satisfy the elements of the child-sex-trafficking offense."). Put another way, to be criminally liable under § 1591, and thus to be subject to

29

§ 2G1.3(a)(2), a defendant need only put the victim in a position where a sex act could occur, regardless of whether a sex act eventually did occur. See Mozie, 752 F.3d at 1286–87 ("It is enough that Mozie 'recruited' the victims . . . to engage in commercial sex acts even though they did not actually do so."). By contrast, the § 2G1.3(b)(4)(A) enhancement reaches only offenses where a sex act or sexual conduct actually did occur. It follows that § 2G1.3(a)(2) and § 2G1.3(b)(4)(A) punish different harms. And because they do, applying both of them did not amount to impermissible double counting. See Matos-Rodriguez, 188 F.3d at 1309.

Finally, Blake contends that his sentence is substantively unreasonable. We review the substantive reasonableness of a sentence only for an abuse of discretion. United States v. Irey, 612 F.3d 1160, 1188–89 (11th Cir. 2010) (en banc). "That familiar standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." Id. at 1189 (quotation marks omitted). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." Id. "In the context of sentencing, the proper factors" for the district court to consider "are set out in 18 U.S.C. § 3553(a)." Id.

30

The district court carefully considered the § 3553(a) factors before it handed down Blake's sentence. It granted him a downward variance from a guideline range of life imprisonment to 324 months because it considered the guidelines range "excessive." Given all of the facts and circumstances, it is not an unreasonable sentence.

### 3. The Calculation of Moore's Sentence

The PSR stated that Moore's base offense level was 30, and after applying the relevant enhancements it calculated her total offense level to be 49. Like Blake's, Moore's offense level was then readjusted to the maximum permissible level, 43. See U.S.S.G. § 5A cmt. n.2. With a criminal history category of I, her guidelines range was life. See id. § 5A. She made a number of objections to the PSR, including adopting Blake's arguments with respect to the double-counting issue.

After overruling the § 2G1.3(b)(4) objection and resolving her other objections, the district court calculated Moore's adjusted offense level as 41, with a corresponding advisory guidelines range of 324 to 405 months imprisonment. See id. § 5A. In applying the § 3553(a) factors to Moore, the district court explained that Moore "[was] a victim of Mr. Blake" and that Blake had "s[een] a vulnerable, undereducated, insecure, weak individual who had a troubled past, just like the victims, used her as a victim of prostitution, and then used her as his right-hand

31

person to perpetrate the crimes that we're here for." The court balanced Moore's victimization with her culpability, sentencing her to 180 months imprisonment followed by 240 months supervised release. That term of imprisonment was a downward variance 144 months below the low end of Moore's advisory guidelines range.

## 2. Moore's Sentencing Issues

Moore raises two issues about her sentence. The first one is the same impermissible double-counting issue as Blake, and we reject her arguments for the same reasons we rejected Blake's identical arguments on that issue.

Like Blake, Moore challenges the substantive reasonableness of her sentence, which was 180 months imprisonment. As we have just pointed out, that sentence resulted from a 144-month downward variance from the bottom of her guideline range of 324 to 405 months. Given that substantial downward variance and all of the other facts and circumstances in the case, we cannot conclude that Moore's sentence amounts to an abuse of discretion or a clear error of judgment on the part of the district court.

**AFFIRMED.**