[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16921
Non-Argument Calendar

_____

D.C. Docket No. 1:15-cr-20800-KMW-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DESMOND ALEXANDER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 14, 2017)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Desmond Alexander appeals his convictions under the Maritime Drug Law Enforcement Act ("MDLEA") for conspiring to possess and possessing with intent distribute 1,000 kilograms or more of marijuana on board a vessel subject to the jurisdiction of the United States.  Alexander argues that insufficient evidence supported the jury's finding that the offense involved 1,000 kilograms or more of marijuana, that the district court abused its discretion in admitting evidence of his post-arrest, pre-*Miranda*[1] silence, and that the MDLEA is unconstitutional as applied to him.  Alexander also challenges his 120-month sentence of imprisonment, which is the statutory minimum under the MDLEA for an offense involving 1,000 kilograms or more of marijuana.  He argues that excluding MDLEA defendants from relief under the so-called "safety valve," 18 U.S.C. § 3553(f), violates equal protection.  After careful review, we affirm.

## I.

In the light most favorable to the verdict, the relevant facts are these.[2]  On the night of September 19, 2015, a marine patrol aircraft spotted a suspicious vessel traveling east in international waters about 70 nautical miles south of the Dominican Republic.  The aircraft notified the U.S. Coast Guard cutter *Richard Dixon*, which moved to intercept.  Approximately three hours later, in the early

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] "We review *de novo* whether there is sufficient evidence in the record to support a jury's verdict in a criminal trial, viewing the evidence in the light most favorable to the government, and drawing all reasonable factual inferences in favor of the jury's verdict." *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009).

2

morning hours of September 20, the *Richard Dixon* arrived in the area of the suspect vessel, which was still in international waters, and then launched a small chase boat with a crew of four.

The chase boat, commanded by Boatswain's Mate Travis Mills, approached the vessel and turned on its blue lights, which is an international sign for law enforcement. Using a megaphone, Mills identified himself as a Coast Guard officer and commanded the vessel to stop. Instead of stopping, the vessel made a 180-degree turn and fled, maneuvering erratically. Mills observed three men on board the vessel, including one who fell or jumped overboard during the pursuit. The vessel eventually stopped when the chase boat fired a warning shot across its bow.

Once the suspect vessel had stopped, the chase boat went to rescue the overboard man, later identified as Alexander, from the water. Meanwhile, the two men who remained on the vessel began throwing packages, or "bales," into the water. The chase boat made its way back to the vessel and recovered three of the bales, which smelled of marijuana.

Because the vessel did not identify its nationality, Mills began asking a series of "right of approach" questions to determine the master of the vessel, the nationality of the vessel, and its destination, among other things. According to the vessel's master, the vessel was of Jamaican origin and was bound for Antigua to

3

deliver the packages in the bow of the boat. Mills observed that these packages were wrapped similarly to the bales recovered from the water. Mills relayed this information to the *Richard Dixon*, which used the information to contact Jamaican authorities about the suspect vessel.

While the chase-boat crew waited for permission from the *Richard Dixon* to board, the vessel began to take on water. The chase-boat crew received orders to remove some of the packages from the vessel and to bring its three crewmembers to the cutter. The chase-boat crew transferred eleven or twelve bales from the vessel to the chase boat and then returned to the cutter with Alexander and the other two men. The crew also brought the vessel and attached it to the cutter. After about an hour, however, the vessel again began to take on water, so the remaining bales were removed and brought on board the *Richard Dixon*. Some of the bales slid into the water during this recovery effort.

Chief Petty Officer Wesley Stigsell testified that he conducted an inventory of the items recovered from the vessel. Stigsell counted a total of 49 bales of suspected marijuana. Mills estimated that each bale he lifted weighed around 50 pounds. Another member of the chase-boat crew, Engineering Officer of the Watch Michael Lagasca, estimated that each bale weighed around 40 to 50 pounds. Thereafter, the contraband and vessel crewmembers were transferred to the United States Coast Guard cutter *Resolute*.

4

On September 29, 2015, the Coast Guard delivered a shipment of marijuana to the DEA in Miami, Florida. DEA Special Agent Peter David Yates testified that he received 49 bales of marijuana from the Coast Guard and then weighed them on an electronic scale. He recorded a total weight of 1,251 kilograms, which included the weight of the packaging. After he had weighed the bales, Yates took what he described as a "representative sample" from the bales for testing by the DEA laboratory.

According to Yates, each bale was composed of multiple compressed "bricks" of marijuana that were wrapped in a black trash bag and then taped with "packing tape." The stacked bricks were then wrapped in a white "burlap plastic sack." Yates testified that the white sacks encasing the bales were "very, very light" and did not weigh more than a "Publix trash bag," and that the black bags and tape encasing each brick were "very light" and weighed only "slightly more" than the white sacks. Yates's description of the packaging was consistent with the descriptions provided by other witnesses, including Peter Imbriale, the Executive Officer of the *Richard Dixon*. The jury also saw several pictures of the bales. Yates did not weigh the packaging materials separately.

## II.

After his arrest, Alexander and two codefendants, Garth Forrest and Derrick Findely, were indicted on one count of conspiracy to possess with intent to

distribute 1,000 kilograms or more of marijuana while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(a) and (b), and 21 U.S.C. § 960(b)(1)(G), and one count of possession with intent to distribute 1,000 kilograms or more of marijuana while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(a), 21 U.S.C. § 960(b)(1)(G), and 18 U.S.C. § 2. Forrest, who was identified as the master of the vessel, was also charged with failure to heave to, in violation of 18 U.S.C. § 2237(a)(1). Forrest pled guilty to the conspiracy charge and agreed to cooperate with the government by testifying at Alexander's trial. Findely pled guilty but did not testify at trial.

Before trial, Alexander moved to dismiss the indictment on grounds that the MDLEA was unconstitutional as applied to him. The district court denied the motion, concluding that Alexander's arguments were foreclosed by binding circuit precedent. Also before trial, the government filed a certification that the vessel was "without nationality," and therefore subject to the jurisdiction of the United States. *See* 46 U.S.C. § 70502(c)(1), (d).

Trial began on August 9, 2016. During the trial, the prosecutor read the following stipulation to the jury:

> The United States, Defendant Desmond Alexander, and his undersigned counsel hereby stipulate and agree to the following facts which the jury must accept as having been proved beyond a reasonable doubt:

6

[T]he substance recovered from international waters on September 20, 2015[,] by the United States Coast Guard Cutters Richard Dixon and Resolute is, in fact, marijuana.

At the close of the government's case-in-chief, Alexander moved for a judgment of acquittal under Rule 29, Fed. R. Crim. P., which the district court denied. Alexander then presented his defense, offering, among other evidence, video-recorded deposition testimony from Kellion Martin Campbell and Errol Dawson. The gist of this evidence was that Alexander had boarded the vessel out of desperation to leave Jamaica and return to his home in Antigua because he had been threatened by a suitor of Campbell, Alexander's girlfriend.

During the government's rebuttal case, the district court allowed the government to elicit testimony from two crewmembers of the *Richard Dixon* about Alexander's failure to mention that innocent explanation after he had been taken into custody but before he had been given *Miranda* warnings. The prosecutor referenced this testimony during closing arguments.

Following the close of all the evidence, Alexander made a renewed motion for judgment of acquittal, arguing that the government's evidence failed to prove drug quantity beyond a reasonable doubt. The district court denied the motion, stating that the issues regarding drug weight were factual ones for the jury. Alexander was convicted on both charges. The jury specifically found that he was responsible for 1,000 kilograms or more of marijuana. The district court sentenced

7

Alexander to concurrent terms of 120 months of imprisonment, the statutory minimum penalty for his offenses.  Alexander now appeals.

## III.

Alexander challenges his convictions on three main grounds.  First, he contends that the government failed to prove beyond a reasonable doubt that the offense involved 1,000 kilograms or more of marijuana.  Second, he argues that the district court abused its discretion by admitting his post-arrest, pre-*Miranda* silence.  Finally, he maintains that the MDLEA is unconstitutional as applied to him, though he acknowledges that our precedent is to the contrary.  We address each argument in turn.

### A.    *Sufficiency of the Evidence of Drug Quantity*

Describing the manner in which the government sought to prove the weight of the marijuana as "lackadaisical," Alexander maintains that the evidence was too speculative to meet the government's burden of proof.  He contends that the government failed to prove whether all of the recovered substance was marijuana, whether the marijuana that DEA Special Agent Yates weighed actually came from Alexander's vessel, and whether the marijuana itself, without including the weight of packaging or the potential weight of water, weighed 1,000 kilograms or more.

We review *de novo* whether sufficient evidence in the record supports the jury's verdict in a criminal trial.  *United States v. Wilchcombe*, 838 F.3d 1179,

8

1188 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 2265 (June 19, 2017). The evidence, which we view in the light most favorable to the government, "must be such that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted). In reviewing the evidence, we assume that the jury made all credibility choices in support of the verdict, and we accept all reasonable inferences that tend to support the government's case. *Id.*

The government was required to prove beyond a reasonable doubt that the offense involved 1,000 kilograms or more of marijuana because that finding increased the statutory minimum sentence. *See Alleyne v. United States*, 133 S. Ct. 2151, 2158 (2013) ("Facts that increase the mandatory minimum sentence are therefore elements and must be submitted to the jury and found beyond a reasonable doubt."). Specifically, the jury's finding of 1,000 kilograms or more of marijuana increased Alexander's minimum sentence to ten years of imprisonment. *See* 21 U.S.C. § 960(b)(1)(G); *cf. id.* § 960(b)(2)(G) (providing for a statutory minimum of five years of imprisonment for an offense involving 500 to 999 kilograms of marijuana).

Here, sufficient evidence supports the jury's finding beyond a reasonable doubt that the offenses involved 1,000 kilograms or more of marijuana. As to the nature of the substance, Alexander stipulated at trial that the substance recovered

9

by the Coast Guard on September 20, 2015, was "in fact, marijuana." By stipulating to an essential element of the crime charged, Alexander removed the government's burden of proof on that element. *United States v. Hardin*, 139 F.3d 813, 815–16 (11th Cir. 1998). Thus, we do not address Alexander's arguments about the DEA's drug-testing methods because he waived his right to contest whether the substance was marijuana. *See id.*

Next, sufficient evidence supports the jury's finding that the bales that were weighed by DEA Special Agent Yates were from Alexander's vessel as opposed to another interdiction. The evidence reflects that the *Richard Dixon* recovered 49 bales of marijuana from Alexander's vessel and transferred them to the *Resolute*. Then, on September 29, 2015, shortly after the interdiction, Yates received from the Coast Guard the exact same number of bales of marijuana, which weighed 1,251 kilograms. Although the government did not directly establish that the bales recovered by the *Richard Dixon* were the same bales that Yates weighed, there is no evidence that the *Richard Dixon* or the *Resolute* engaged in another interdiction from September 19 through September 29. Plus, the jury was able to compare Yates's description of the bales' packaging with pictures of the bales onboard the *Richard Dixon*. Viewing the evidence in the light most favorable to the verdict, a jury reasonably could have inferred that the 49 bales of marijuana that were

10

recovered from Alexander's vessel were the same 49 bales of marijuana that were delivered to the DEA in Miami and weighed by Yates.

As for the weight of the marijuana, the government produced sufficient, credible evidence to support the jury's finding that the marijuana weighed 1,000 kilograms or more. Yates testified that he weighed the 49 bales of marijuana on an electronic scale and that the total weight was 1,251 kilograms, or around 2,752 pounds (using a conversion rate of 2.2 pounds to 1 kilogram). Although Yates did not weigh the packaging, we disagree with Alexander that the government's evidence was too speculative to support his conviction. *See United States v. Villegas*, 911 F.2d 623, 628 (11th Cir. 1990) ("In a criminal case, the ultimate burden on the government is the ability to draw a reasonable inference, and not a speculation, of guilt.").

A reasonable jury could have concluded beyond a reasonable doubt that excluding the weight of the packaging from the total weight would not have brought the marijuana weight below 1,000 kilograms. The packaging would have made a material difference only if it weighed a total of around 250 kilograms, or 550 pounds (using the same conversion rate as above), or more. Divided by 49 bales, that works out to just over 11 pounds of packaging per bale. Yates's testimony, however, reflects that the weight of the packaging was minimal.

11

Yates testified that the white sacks that encased the bales were "very, very light" and did not weigh more than a "Publix trash bag," and that the black bags and tape that encased each brick in the bale were also "very light" and weighed only "slightly more" than each of the white sacks. Although Yates did not provide a concrete number for the weight of the packaging, he provided a common reference point—the weight of a plastic trash bag—from which the jury could have drawn a reasonable inference that the packaging did not add over ten pounds to each bale. *See United States v. Gainey*, 111 F.3d 834, 836 (11th Cir. 1997) ("In evaluating the facts of a case, the law permits jurors to apply their common knowledge, observations and experiences in the affairs of life." (internal quotation marks omitted)). We therefore conclude that Yates's testimony was sufficiently definite to support the jury's finding that excluding the weight of the packaging did not bring the weight of the marijuana itself below 1,000 kilograms.

Alexander also contends that Yates's testimony is insufficient because he relied on his knowledge from other cases and stated that he did "not recall specifically" what the packaging looked like in this case. However, Yates's description of the packaging was entirely consistent with the description provided by Executive Officer Imbriale, among others, and the jury was able to compare Yates's description with the pictures admitted into evidence. Based on the

evidence as a whole, the jury reasonably could have credited Yates's testimony about the weight of the packaging material.

As for the possibility of the marijuana bales being water-logged, the jury reasonably could have concluded from the evidence that the bales were packaged in such a way as to make them waterproof, or nearly so.  The jury saw and heard evidence of the bales' packaging.  And it is reasonable to infer that drug-traffickers transporting product over open water in a vessel like the one in this case, which began to take on water once stopped, would attempt to make the packaging water-tight.  While some of the bales in this case were recovered from the water, the bales remained buoyant, suggesting that they had not taken on water.  Plus, there was no evidence that any of the marijuana was wet when the bales were weighed.  From this evidence, a jury reasonably could have found that any potential water weight was negligible.

While the government clearly could have done more to prove drug quantity with greater specificity, we cannot conclude that the evidence was insufficient to support a finding beyond a reasonable doubt that the offenses involved 1,000 kilograms or more of marijuana.  Accordingly, we affirm the denial of Alexander's motion for judgment of acquittal.

13

B.    *Post-Arrest, Pre*-Miranda *Silence*

Alexander next argues that the district court abused its discretion by allowing government witnesses to testify as to his silence after his arrest but before *Miranda* warnings were given.  We review evidentiary rulings for an abuse of discretion.  *United States v. Blake*, 868 F.3d 960, 975 (11th Cir. 2017).

The Supreme Court has held that a defendant's post-arrest, pre-*Miranda* silence is admissible for impeachment purposes.  *See Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993) ("[T]he Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest, or after arrest if no *Miranda* warnings are given." (citations omitted)); *United States v. Robinson*, 485 U.S. 25, 32 (1988) (holding that prosecutorial references to a defendant's silence are permissible when they are a "fair response to a claim made by defendant or his counsel"); *Wilchcombe*, 838 F.3d at 1190 ("[T]he Constitution does not prohibit the use for impeachment purposes of a defendant's silence . . . after arrest if no *Miranda* warnings are given.").  According to the Supreme Court, such silence may be probative "and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty."  *Brecht*, 507 U.S. at 628.

This Circuit "goes a step further. We permit the prosecution to use a defendant's post-arrest, pre-*Miranda* silence as direct evidence that may tend to prove the guilt of the defendant."  *Wilchcombe*, 838 F.3d at 1190; *see United States*

14

*v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991) ("[T]he government may comment on a defendant's silence when it occurs after arrest, but before *Miranda* warnings are given.").

Alexander argues that the government's use of his post-arrest, pre-*Miranda* silence violated his Fifth Amendment rights to due process and against self-incrimination.   As he acknowledges, however, his argument is foreclosed by *Wilchcombe* and *Rivera*, which, though troubling, are nonetheless binding on us as a panel.  *See United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008) ("Under the prior precedent rule, we are bound to follow a prior binding precedent unless and until it is overruled by this court en banc or by the Supreme Court." (internal quotation marks omitted)).  In light of those decisions, we cannot find that the district court abused its discretion by permitting the government to introduce limited evidence of Alexander's pre-*Miranda* silence in order to rebut defense evidence.  That is true even if Alexander is correct that the evidence was admitted as substantive evidence of his guilt rather than as impeachment evidence.[3]

## C.    *Constitutionality of the MDLEA*

Alexander next argues that the MDLEA is unconstitutional as applied to him.  He argues that Congress's power to punish felonies on the high seas does not extend to drug-trafficking offenses with no nexus to the United States, particularly

---

[3] We decline Alexander's request to refer this case for *en banc* review, though we note that he is free to move for rehearing *en banc* under Rule 35, Fed. R. App. P.

offenses involving marijuana, which is no longer universally condemned.  He further asserts that it violates due process for courts to exercise jurisdiction over conduct without such a nexus.  He also maintains that the MDLEA violates his rights under the Fifth and Sixth Amendments because it removes the factual basis of the jurisdictional requirement from the jury.  Acknowledging contrary circuit precedent, Alexander seeks to preserve these issues for further review.

The Constitution permits Congress to "define and punish Piracies and Felonies committed on the high Seas."  U.S. const. Art. I, § 8, cl. 10.  The MDLEA prohibits individuals from "knowingly or intentionally . . . manufactur[ing] or distribut[ing], or possess[ing] with intent to manufacture or distribute, a controlled substance" on board "a vessel of the United States or a vessel subject to the jurisdiction of the United States."  46 U.S.C. § 70503(a), (e); *see also United States v. Campbell*, 743 F.3d 802, 805 (11th Cir. 2014).  Under the MDLEA, a "vessel subject to the jurisdiction of the United States" includes "a vessel without nationality," a term which includes "a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed."  46 U.S.C. § 70502(c)(1)(A), (d)(1)(A).

In 1996, Congress amended the MDLEA to provide that "[j]urisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense." 46 U.S.C. § 70504(a); *see Campbell*, 743 F.3d at 805.  Instead,

16

jurisdictional issues under the MDLEA "are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a).

Alexander's challenges to the MDLEA are foreclosed by our prior precedent. *See, e.g.*, *Wilchcombe*, 838 F.3d at 1186; *United States v. Cruickshank*, 837 F.3d 1182, 1187–88 (11th Cir. 2016), *Campbell*, 743 F.3d at 809–12; *United States v. Rendon*, 354 F.3d 1320, 1324–28 (11th Cir. 2003); *United States v. Tinoco*, 304 F.3d 1088, 1108–12 (11th Cir. 2002). In *Campbell*, for example, we affirmed the constitutionality of the MDLEA as applied to an unregistered vessel trafficking marijuana on the high seas. *Campbell*, 743 F.3d at 809–12. We held that (1) the MDLEA is a valid exercise of Congress's power under the Felonies Clause as applied to offenses without a nexus to the United States, *id.* at 810; (2) a conviction under the MDLEA does not violate a defendant's right to due process under the Fifth Amendment even when the offense lacks such a nexus, *id.* at 812; and (3) the Fifth and Sixth Amendments do not require a jury to determine whether extraterritorial jurisdiction exists under the MDLEA, *id.* at 809. *Campbell* remains good law. *See, e.g.*, *Cruickshank*, 837 F.3d at 1188 (concluding that *Campbell* foreclosed a defendant's challenges to the MDLEA).

For these reasons, the district court properly denied Alexander's motion to dismiss the indictment.

**IV.**

Finally, Alexander argues that his sentence should be vacated because, in his view, denying safety-valve relief to defendants convicted under the MDLEA violates equal protection.  We ordinarily review *de novo* the constitutionality of a statute, because it presents a question of law, but we review for plain error only where a defendant raises his challenge for the first time on appeal.  *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010).  Because Alexander did not raise this specific issue before the district court, we review for plain error.[4]

"To find plain error, there must be: (1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights."  *United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015) (quoting other sources).  If those three conditions are met, we may correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *Id.*  For an error to be "plain," it must be "obvious and clear under current law."  *United States v. Eckhardt*, 466 F.3d 938,

---

[4] We are not persuaded by Alexander's assertion that the district court violated *United States v. Jones*, 899 F.2d 1097 (11th Cir. 1990), *overruled on other grounds by United States v. Morrill*, 984 F.2d 1136 (11th Cir. 1993) (*en banc*), such that *de novo* review applies.  *Jones* requires district courts to give parties an opportunity, following the imposition of sentence, "to object to the district court's ultimate findings of fact and conclusions of law and to the manner in which the sentence is pronounced."  *Jones*, 899 F.2d at 1103.  Here, the court did so.  After imposing sentence, the court asked defense counsel if he "object[ed] to the Court's finding of fact or the manner in which sentence was pronounced?"  The fact that the court did not specifically mention "legal" objections does not mean that the court failed to elicit "fully articulated objections."  Indeed, defense counsel clearly "understood the court to be eliciting objections," including legal ones.  *United States v. Campbell*, 473 F.3d 1345, 1348 (11th Cir. 2007).  In fact, in response to the court's question, defense counsel re-raised a legal objection to the constitutionality of the MDLEA, which flatly contradicts Alexander's current claim that counsel did not understand the court to be eliciting legal objections.  We review for plain error.

18

948 (11th Cir. 2006).  Unless the explicit language of a statute or rule specifically resolves an issue, there can be no plain error without precedent from the Supreme Court or this Court directly resolving the issue.  *Hesser*, 800 F.3d at 1325.

The "safety valve" permits a district court to sentence certain drug offenders below any applicable statutory minimum sentence.  *See* 18 U.S.C. § 3553(f). Specifically, "in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963)," the court shall sentence the defendant "without regard to any statutory minimum sentence" if the court finds at sentencing that the defendant has met five listed criteria.  *Id.*

In *United States v. Pertuz-Pertuz*, 679 F.3d 1327 (11th Cir. 2012), we held that, under the plain language of § 3553(f), defendants convicted under the MDLEA are not eligible for safety-valve relief.  *Id.* at 1328.  We explained that, by its terms, the safety valve applies only to convictions under the five listed statutes—21 U.S.C. §§ 841, 844, 846, 960, and 963.  *Id.*  Reasoning that the express selection of five statutes reflects an intent to exclude others, we held that a conviction under 46 U.S.C. § 70503 does not qualify for the safety valve because "no Title 46 offense appears in the safety-valve statute." *Id.*

Alexander argues that the exclusion of the MDLEA from the safety valve violates equal protection because there is no rational basis to deny safety-valve

19

relief to offenders who commit wholly foreign drug offenses while making it available to offenders who commit the same offenses within the territorial United States. In short, Alexander maintains that geography alone is not a good enough reason to exclude MDLEA defendants from the safety valve. The government responds that Alexander cannot show plain error and that there are, in fact, good reasons apart from geography to distinguish between international drug trafficking and domestic drug trafficking for purposes of the safety valve.

Apart from citing the district court's statements at the sentencing hearing, Alexander has pointed us to no authority on this issue. Our own research reflects that neither the Supreme Court nor this Court has addressed whether Congress's decision to exclude offenses under the MDLEA from the safety-valve statute violates equal protection. Accordingly, Alexander has not shown that any error, if one occurred, was "plain." *See Hesser*, 800 F.3d at 1325. We therefore affirm Alexander's 120-month sentence.

## V.

For the reasons stated, we **AFFIRM** Alexander's convictions and total sentence.