J-A11022-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
SHAURICE DUPRE CLARK :
:
Appellant : No. 552 WDA 2022

Appeal from the Judgment of Sentence Entered January 19, 2022
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0000230-2021

BEFORE: BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED: September 11, 2023**

Appellant, Shaurice Dupre Clark, was convicted of two counts of aggravated assault, one count of carrying a firearm without a license, possessing instruments of crime, and recklessly endangering another person, all of which stemmed from his firing a handgun at a vehicle. The trial court imposed a sentence of 102 to 216 months of incarceration. We agree with Appellant that the trial court erred in ruling on Appellant's motion to suppress evidence recovered from the execution of warrants for Appellant's phone and Facebook accounts. As explained in the body of this memorandum, it is not clear what evidence introduced at trial, if any, the Commonwealth obtained from the warrants. We therefore retain jurisdiction and direct the trial court

---

[*] Retired Senior Judge assigned to the Superior Court.

to hold a hearing on this matter. With respect to Appellant's other claims, we find no error.

**I.**

On August 30, 2020, at 7:03 p.m., officers were dispatched to investigate a reported shooting at 17th and Poplar Streets. A few minutes later, officers received reports of another shooting at 16th and Chestnut, which was approximately five blocks from the Poplar shooting. Patrolman Leroy Learn was the first to arrive, and he observed five shell casings on the ground. Patrolman Justin Seath arrived shortly afterwards, and a witness handed him an item described as "a small wallet keychain," which the witness had found on the ground. N.T. Trial, 11/5/21, at 86. That item included a key to a Mitsubishi vehicle, as well as a WIC card[1] bearing a sixteen-digit identification number. Sergeant Craig Stoker later served a search warrant on the Commonwealth's Department of Health and determined that the card belonged to Savannah Lopez, who had a son, L.C. Further investigation established that Appellant was the father of L.C. DNA testing established that Appellant's "DNA was one of three individuals with DNA on the key and keychain…." Trial Court Opinion, 9/1/22, at 9. Additionally, officers discovered that the Mitsubishi had been struck by bullets at the Poplar scene.

The police located several surveillance cameras and obtained the relevant recordings, one of which shows the shooter pursuing a black BMW.

---

[1] The Special Supplemental Nutrition Program for Women, Infants and Children.

As described in the affidavits of probable cause for the search warrants, the video depicts "a black male with long hair wearing a dark colored sweat shirt with a zipper. Under the sweat shirt[,] the driver/shooter had on a purple t-shirt with a square picture. He was also wearing dark colored pants and purple and black shoes." Affidavit of Probable Cause, 10/15/20, at 2. Patrolman Nicholas Strauch immediately identified Appellant as the man depicted in the videos and, on this basis, the police began investigating Appellant as the primary suspect.

At trial, the Commonwealth emphasized that the shooter's sneakers and sweatshirt, as captured by one of the surveillance videos, were distinctive. This screenshot taken from that video is illustrative of the sneakers:



The affidavit's reference to a "square picture" is visible in the following screenshot from the same exhibit:



The Commonwealth introduced photographs it recovered from the execution of search warrants upon Appellant's phone and Facebook accounts. Specifically, the Commonwealth introduced photographs depicting Appellant wearing purple shoes, as well as an image of an individual with his back to the camera wearing a sweatshirt with a photograph. The Commonwealth argued that these articles matched what the shooter wore.

Appellant was convicted and sentenced on January 19, 2022, as previously stated. Appellant timely filed post-sentence motions, which were denied by order and opinion filed April 6, 2022. Appellant timely filed a notice of appeal and complied with the trial court's order to file a concise statement.

The court issued its opinion in response, and we now address Appellant's four claims:

> 1. Did the trial court commit an abuse of discretion when it admitted all of the surveillance videos, over Appellant's objection, as the Commonwealth did not present a witness capable of authenticating that what was portrayed on the videos was a fair and accurate depiction of the events that occurred?
>
> 2. Did the trial court commit an abuse of discretion when it permitted the Commonwealth to introduce Facebook images/videos as the Commonwealth could not authenticate who authored, created or posted the material?
>
> 3. Did the trial court commit an abuse of discretion when it permitted the Commonwealth to call officer Nicholas Strauch, over Appellant's objection, where his testimony invariably suggested that Appellant had multiple interactions with the police and/or the police had an uncommon familiarity with Appellant as the probative value of this testimony was outweighed by its prejudicial effect?
>
> 4. Did the trial court err when it denied Appellant's request to suppress the data and images retrieved from the iPhone and Facebook as the police lacked probable cause to search the iPhone and as the search warrants for both were unconstitutionally over-broad?

Appellant's Brief at 8 (reordered for ease of disposition).

## II.

Appellant's first issue challenges the admission of multiple surveillance camera videos. Appellant posits that the Commonwealth failed to authenticate the surveillance videos because it failed to call any witness with personal knowledge of what the videos depicted:

> In the instant case, no person with personal knowledge of the day's events provided any testimony that the videos taken … accurately depicted the events that occurred on that day. Rather,

the Commonwealth purported to authenticate these videos by presenting the testimony of individuals who either installed the surveillance equipment or had familiarity with the system.

Appellant's Brief at 47.

We conclude that the Commonwealth sufficiently authenticated the videos. Pennsylvania Rule of Evidence 901 governs the authentication of evidence. "Unless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901. The Rule includes a list of "examples only—not a complete list— of evidence that satisfies" this requirement. Pa.R.E. 901(b). "Generally, authentication requires a low burden of proof," *Commonwealth v. Jackson*, 283 A.3d 814, 818 (Pa. Super. 2022), as the Rule simply requires that the proponent offer "evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). We review the trial court's ruling for an abuse of discretion. *Commonwealth v. Mangel*, 181 A.3d 1154, 1159 (Pa. Super. 2018).

Appellant faults the Commonwealth for failing to call a witness who directly observed the incidents. Appellant's Brief at 46 ("Rule 901(b)(1) provides that one way of satisfying the requirement is through the testimony of a witness with knowledge that an item is what it is claimed to be.") (internal quotation marks omitted). This is an accurate statement of the law. However, the Commonwealth did not rely on this theory of authentication. Instead, the Commonwealth relied on the evidence of the technicians who were familiar

with the video surveillance system to authenticate the items. This falls within the scope of Pa.R.E. 901(b)(9), which permits authentication based on "[e]vidence describing a process or system and showing that it produces an accurate result." Pa.R.E. 901(b)(9).

The trial court did not explicitly cite this provision, but its order and opinion denying Appellant's post-sentence motions alluded to these concepts, concluding that the "Commonwealth showed that [the cameras] were functioning properly at the time in question, the positioning of the cameras[,] and that those cameras were surveilling and recording the areas and streets that they were specifically designed to view and record." Opinion and Order Denying Post-Sentence Motions, 4/7/22, at 3 (unnumbered). We agree with the trial court.

We briefly note Appellant's discussion of **Commonwealth v. McKellick**, 24 A.3d 982 (Pa. Super. 2011), which Appellant states is the one decision "that permitted the Commonwealth to allow a third party, who did not personally observe the events in question, to authenticate a video purporting to show those events." Appellant's Brief at 48. In **McKellick**, the Commonwealth prosecuted the defendant for a DUI. The Pennsylvania State Trooper who arrested McKellick was killed in the line of duty, and the Commonwealth presented a video of the dashboard-mounted video camera, which was narrated by testimony from other Pennsylvania State Police

Troopers who were generically familiar with the recording system.[2] We held that the recording was sufficiently authenticated because of their familiarity with the system and the lack of an allegation that the video had been fabricated or altered.

Appellant argues that this case is distinguishable from **McKellick** because "Detective Stoker's own testimony revealed that multiple, innocent bystanders were present at the corner of 16th and Chestnut Streets at the time of the shooting." Appellant's Brief at 48. Appellant also cites the dissenting opinion of then-Judge, now Justice, Donohue, which argued, in pertinent part, that a witness cannot authenticate a video "merely by watching it and then offering that it 'is what it purports to be'" because that "is at best tautological and circular … which is worthless for authentication purposes." **McKellick**, 24 A.3d at 997 (Donohue, J., dissenting).

We conclude that **McKellick** is distinguishable. As then-Judge Donohue's dissent explained, in that case, the Commonwealth made no attempt to authenticate the video under a Rule 901(b)(9) theory:

> Pa.R.E. 901(b)(9) provides that authentication of evidence (including substantive evidence) may, in appropriate cases, be achieved upon presentation of "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Pa.R.E. 901(b)(9). Appellate courts in other states have permitted the authentication of photographs and video recordings (typically from stationary surveillance cameras) under similar evidentiary rules upon

---

[2] McKellick's appellate claims were largely directed towards whether the admission of the video evidence without the arresting officer's testimony violated the Confrontation Clause.

adequate proof that (1) the photograph has not been altered in any significant respect, (2) the method by which the camera was activated, (3) evidence of the time interval between frames, if applicable, (4) evidence of the date the photographs were taken, (5) the chain of custody of the film after its removal from the camera, and (6) testimony of a competent witness who can explain what the photograph portrays even though he was not present when the photograph was taken. *See, e.g.*, *State v. Pulphus*, 465 A.2d 153, 161 (R.I. 1983) (collecting cases from other jurisdictions). In addition, a proper foundation in these cases has also required evidence that the images portrayed fairly and accurately the place in question (*e.g.*, the inside of a bank), and of the reliability of its production process. *Id.*

To my knowledge, no Pennsylvania appellate court has ruled on the applicability of Rule 901(b)(9) to authenticate photographs or video records. That issue is not presently before this Court, in part because the Commonwealth made no attempt to authenticate the videodisk under Rule 901(b)(9) so that it could be admitted as substantive evidence.

*Id.* at 994 (Donohue, J., dissenting) (bracketing in original).

The Commonwealth's method of authenticating the surveillance videos in this case is not what occurred in *McKellick*, where the troopers authenticated the video without reference to the reliability of the underlying system which captured the incident. In contrast to that case, here, the Commonwealth offered testimony from witnesses who discussed the operability of each surveillance system that the Commonwealth used at trial.[3] The trial court therefore did not err in admitting the evidence.

_____

[3] Then-Judge Donohue's dissent in *McKellick* noted the absence of a precedential decision addressing the applicability of Rule 901(b)(9), and that appears to still be the case. In concluding that the Commonwealth presented sufficient evidence to authenticate the videos as part of a process or system that produces an accurate result, we do not attempt to set forth a list of factors

*(Footnote Continued Next Page)*

## III.

Appellant's second issue likewise concerns authentication, and addresses evidence introduced at trial from various Facebook accounts. Appellant cites Rule 901(b)(11), which specifically addresses the authentication of digital evidence, stating:

> **(a) In General.** Unless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> **(b) Examples.** The following are examples only--not a complete list--of evidence that satisfies the requirement:
>
> \*\*\*
>
> (11) *Digital Evidence.* To connect digital evidence with a person or entity:
>
>> (A) direct evidence such as testimony of a person with personal knowledge; or
>>
>> (B) circumstantial evidence such as:
>>
>>> (i) identifying content; or
>>>
>>> (ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

Pa.R.E. 901(a), (b)(11).

---

that are relevant to that determination. Appellant does not claim that the Commonwealth failed to sufficiently authenticate the evidence under Rule 901(b)(9), only that authentication was not possible in the absence of testimony from someone "with personal knowledge of the day's events[.]" Appellant's Brief at 47. Our citation of Rule 901(b)(9) merely demonstrates that Appellant misconstrues the nature of the Commonwealth's theory of authentication.

- 10 -

Appellant has waived this issue by failing to specifically discuss the individual items, which impedes meaningful appellate review. Our review of the record indicates that the Commonwealth introduced at least six pieces of digital evidence that it obtained from Facebook. Commonwealth Exhibit 39 shows Appellant standing in front of the intersection of Poplar and West 17th Street, with the street signs visible. The post includes a text overlay stating, "Pussies said they looking for me I ain't never hiding.'" N.T. Trial, 11/9/21, at 45 (Detective Stoker reading the caption). The owner of that Facebook account was "Dupree Clark"; Dupree is Appellant's middle name.[4] Commonwealth Exhibit 40 shows Appellant, wearing the same clothes as in Exhibit 39, in front of a convenience store. Exhibit 41 is another picture in front of the store, with a caption stating, "Beside the B's life's great." *Id.* at 48 (reading caption).[5] Commonwealth Exhibits 42 and 43 were links posted on Facebook to videos by "Guap Prince," and the video and its audio were played at trial.[6] Commonwealth Exhibit 44 shows a man facing away from the camera, wearing a sweatshirt with a photograph on its back, which the

_____

[4] Appellant's middle name has been spelled as both "Dupree" and "Dupre" in the record.

[5] The transcription is slightly incorrect as the text in the exhibit states, "Beside the **bs** life's great."

[6] This video is not part of the certified record, and we do not know what it contains beyond the limited description given at trial, which essentially indicated that Appellant was in the videos.

- 11 -

Commonwealth argued was the same sweatshirt depicted in the surveillance video.

We conclude that Appellant has waived this claim for failing to specifically discuss each item and the authenticity issues relevant to each. Appellant argues that the Commonwealth "could not authenticate who authored, created, or posted the material." Appellant's Brief at 49. In our view, the concept of "authorship" is not relevant to several of these exhibits, as the probative value lies in their depiction of Appellant wearing purple shoes and/or the sweatshirt. The "author" of the picture in the sense of who took the actual photograph or who uploaded the pictures to Facebook is irrelevant to that purpose. "A photograph may be proven at the trial of a case without calling the person who took it. Nevertheless, the photograph must be shown to be a faithful and accurate reproduction of the object in question." *Semet v. Andorra Nurseries, Inc.*, 219 A.2d 357, 360 (Pa. 1966) (citation omitted). Appellant does not claim that the exhibits in which his face is visible were not actually him.[7]

We agree that there is an authorship component at play with respect to the added captions and the dates, as well as the picture in which no face is shown. For example, whether Appellant wrote the text, "Pussies said they looking for me I ain't never hiding[,]" is relevant to authentication in that the Commonwealth suggested that Appellant wrote that text. However,

_____

[7] The fact that Appellant was present in the courtroom is also relevant, as the jury could simply compare the depictions to Appellant.

- 12 -

Appellant's failure to separately discuss each piece of evidence has impeded appellate review. Appellant attempts to make a global argument to all the evidence, but authorship is irrelevant to several of these exhibits. We therefore conclude that Appellant waived the issue. *See Commonwealth v. Armolt*, 294 A.3d 364, 379 (Pa. 2023) (finding waiver where appellant "submit[ted] only generalized assertions, not arguments, much less reasoned and developed arguments supported with citations to relevant authority.") (cleaned up)

Had Appellant preserved the argument, we would determine that the trial court did not abuse its discretion. We recognized in *Commonwealth v. Koch*, 39 A.3d 996, 1005 (Pa. Super. 2011), *affirmed by an equally divided court*, 106 A.3d 705 (Pa. 2014), that "[o]ften more than one person uses an e-mail address and accounts can be accessed without permission." This principle equally extends to social media platforms like Facebook. *Commonwealth v. Mangel*, 181 A.3d 1154, 1162 (Pa. Super. 2018) ("In our view, the same authorship concerns, as expressed by the *Koch* Court in relation to e-mails and instant messages, exist in reference to Facebook and other social media platforms, that can be accessed from any computer or smart phone with the appropriate user identification and password.").

Circumstantial evidence is sufficient to authenticate digital evidence, and evidence of ownership is a relevant factor. *See Commonwealth v. Orr*, 255 A.3d 589, 601 (Pa. Super. 2021) ("In the present case, while there was no direct testimony concerning the text messages, numerous circumstantial

clues demonstrate that [the a]ppellant sent them. It is clear that [the a]ppellant owned the cell phone."). To illustrate, in **Commonwealth v. Danzey**, 210 A.3d 333, 339 (Pa. Super. 2019), social media accounts bearing names similar to the "Dupree" and "Guap Prince" designations at issue here were linked to the defendant. In **Danzey**, the accounts used the names, *inter alia*, "Bre TheBoss Holland," "Bre Moved on Holland" and "shaunbre76." **Id.** We stated that these accounts were circumstantially linked because Danzey's middle name was "Bree," and he was born in 1976. Additionally, some of the accounts used Danzey's picture as their profile picture. We cited those facts as contextual clues establishing ownership of the accounts. We then cited additional contextual clues to establish that Danzey authored the posts.

Here, Appellant essentially concedes that the Commonwealth established that he owned and controlled the accounts. **See** Appellant's Brief at 52 (conceding that the Commonwealth's testimony "may [have] establish[ed] Appellant's ownership of or control or access to these accounts"). Turning to authorship of the posts, the Commonwealth obtained, through its warrant and Facebook's authentication process, documents from Facebook establishing timestamps for each exhibit. For example, the post showing Appellant standing in front of the intersection of Poplar and West 17th Street was uploaded by the "Dupree Clark" account on August 29, 2020, one day before the shooting at that location. Appellant's middle name is Dupree, and that fact, in conjunction with the timing of the post, circumstantially supports that Appellant authored it. The accompanying text essentially

bragged that Appellant did not fear whoever was "looking for" him, and the prominence of the street signs in the picture suggest that Appellant is telling whoever reads the post where he may be found. The very next day a vehicle belonging to Savannah Lopez, the mother of his child, was struck by gunfire at that location. As another example, the post showing the man in the sweatshirt with the picture on its back was posted on November 23, 2019, which included a comment from a friend wishing Appellant a happy birthday. Appellant's date of birth is November 22. That other members of the public treated the account as belonging to Appellant also supports a conclusion that Appellant controlled and authored the posts introduced at trial. Therefore, even if not waived, we would conclude that the Commonwealth presented sufficient evidence to authenticate the material.

**IV.**

Appellant's third issue concerns the testimony of Patrolman Nicholas Strauch, who informed the jury that he had observed Appellant "conservatively 500 times" in his career. N.T. Trial, 11/8/22, at 108. Appellant contends that this unmistakably conveyed to the jury that Appellant was a prolific criminal and thus prejudiced him.

The parameters of Officer Strauch's testimony was the subject of pre-trial motions by both parties. The Commonwealth's pre-trial motion noted that Patrolman Strauch knew Appellant from his prior work as a probation officer. Additionally, he knew "that [Appellant] had been suspected in prior[,] shots[-]fired calls and has had personal observations of [Appellant] while on

- 15 -

patrol." Commonwealth's Motion *in Limine*, at unnumbered 1, ¶ 6. Additionally, "Patrolman Strauch also had information that [Appellant] is a member of the 1800 Gang in which Patrolman Strauch was collecting intelligence on at the time of the incident." ***Id.*** at unnumbered 2, ¶ 7. Appellant filed a motion to preclude Patrolman Strauch from offering an opinion of who the video depicted.

The parties discussed the issue on day two of the jury trial, and the trial court ruled that it would permit Patrolman Strauch to testify that he identified Appellant to explain the course of the investigation. N.T. Trial, 11/8/22, at 31 ("I'm going to be telling the jury, you're accepting [the] testimony for the limited purpose of … the explanation as to why this investigation began to look at [Appellant]."). After Patrolman Strauch's testimony, the trial court asked if Appellant wanted a cautionary instruction at that point or after cross-examination. Appellant requested that the instruction be given before cross. The court then told the jury that its "observations of the video and anything that happens in the video" is for the jury to determine as the finders of fact. "The testimony of this witness is for the limited purpose of explaining to you how this investigation moved forward with regard to [Appellant]…." ***Id.*** at 114. Appellant now challenges that ruling, claiming that these comments informed the jury that Appellant had a criminal history. ***See*** Appellant's Brief at 55 ("A reference to prior criminal conduct is highly prejudicial to the appellant[,] serving to effectively strip him of the presumption of innocence.") (citation omitted).

We disagree. The Commonwealth's pre-trial motion was clearly directed at introducing evidence touching on Appellant's prior criminal conduct for purposes of establishing identity. The specific details that it wished to admit directly implicated the type of material governed by Pa.R.E. 404(b) and its prohibition on introducing other act evidence. Thus, had the trial court granted the Commonwealth's motion, we would agree with Appellant's view.

However, the trial court only allowed the Commonwealth to inform the jury that Patrolman Strauch was familiar with Appellant due to prior encounters, which was relevant to how the investigation unfolded. The testimony was, on its face, benign. The jury was not told any details about Patrolman Strauch's knowledge of Appellant or his activities, and we do not agree that the testimony, standing alone, suggested a criminal history. The jury would have had to make a leap in logic to conclude that the reference was to criminal conduct. Nor did Patrolman Strauch's testimony veer into opinion testimony, *i.e.*, he did not tell the jury that the individual on the video must have been Appellant based on his knowledge and experience with Appellant.

Appellant submits that the jury must have made this leap because it "never heard an innocuous explanation as to why Strauch knew Appellant so well." **Id.** However, the Commonwealth did not elicit from Patrolman Strauch a non-innocent explanation for his familiarity, either. Appellant chose to put that issue to the jury, as reflected in his brief:

On cross-examination, Strauch admitted that the 500 observations of Appellant were within his career as a police officer and prior to his career. He admitted that he was not related to, friends with, or a social acquaintance with Appellant.

While Strauch's testimony may have been relevant to explain how the police investigation unfolded and while Strauch did avoid references to his history as a probation officer and as a member of the gang and gun task forces, his testimony revealed an uncanny number of observations – *at least 500*. The jury never heard an innocuous explanation as to why Strauch knew Appellant so well. And, while some of those observations may have preceded his time as an Erie Police Officer, the jury learned that Strauch and Appellant were not friends, family, or members of the same social circle. This number of observations invariably tells a jury that this police officer [had] an uncommon familiarity with him and suggests the police either interact with or monitor Appellant. The only conclusion one can draw is that Appellant has a history of criminal activity or suspected criminal activity.

*Id.* (citations to transcript omitted; emphasis in original).

We decline to find that the jury must have concluded that the prior interactions involved crime on the basis that Appellant's own cross-examination made that conclusion more likely.[8] Examining only the trial court's limited ruling, we conclude that the trial court did not abuse its discretion.

_____

[8] We acknowledge that Appellant's cross-examination choices were constrained by the trial court's ruling and the trial court stated that testimony about the officer's particular knowledge would be admissible if Appellant opened the door on cross. However, Appellant could have chosen not to develop the issue further and argued on appeal that the references standing alone unmistakably conveyed to the jury that Appellant was a criminal. We also note that while the Commonwealth told the trial court that it intended to ask "how many times" Patrolman Strauch had encountered Appellant, N.T. Trial, 11/8/22, at 30, the Commonwealth did not indicate that this would have encompassed hundreds of observations. Appellant could have objected to the specific answer.

- 18 -

Moreover, we agree with the trial court that the cautionary instruction adequately addressed any prejudicial effect with respect to the ruling itself. The jury was instructed to consider the evidence for a limited purpose, and the trial court informed the jury that it was required to ultimately determine whether the video depicted Appellant. *See Commonwealth v. Mollett*, 5 A.3d 291, 313 (Pa. Super. 2010) ("Juries are presumed to follow a court's instructions.").

## V.

We now address Appellant's final issue challenging two search warrants, prepared on October 15, 2020, which targeted Appellant's cell phone, and October 21, 2020, which authorized a search of three Facebook accounts. For the following reasons, we agree that the trial court erred by failing to grant suppression. However, we cannot assess whether a new trial is required on this record, and we therefore retain jurisdiction and remand for further proceedings.

The details of the warrant applications and the items to be searched are crucial to Appellant's argument and our conclusion, and we thus quote at length the warrant applications. The October 15, 2020 warrant requested to search the following items:

> All call logs/records, both incoming and outgoing, all electronically or digitally stored [and] saved data files, photographs, videos, voice mails, IMEI number, text, applications and their data, cloud based info, social media contacts, phone contacts, phone file, Apple ID, e-mail or information contained or accessible through the use of this electronic cell phone, internal and external memory data. Contracted service to include but not limited to text

- 19 -

messages, Voice Messages, Digital Photos sent and received, currently stored or access[ed] through the use of electronic device or cell phone.

Application for Search Warrant, 10/15/20, at 1.

To establish probable cause, the warrant relates the circumstances of the shootings and the search warrant linking the WIC card to L.C. and Savannah Lopez, and the investigation connecting Appellant to Lopez and L.C. Significantly, the warrant then indicates that the police had already obtained information from Facebook at this juncture, which we produce *verbatim*:

On 9/6/20 at 13:56 hrs posted Dupree Clark's Facebook (https://www.facebook.com/dupree.clark) are pictures of [L.C.] as well as on 9/18/20 at 09:44 hrs. Both post state Dupree Clark is with Vannah Lopez. Dupree Clark is Shaurice's Facebook page and Vannah Lopez is Savannah Lopez's Facebook Page.

Found on Guap Prince's Facebook Page on 8/28 at 15:36 hrs is Shaurice Clark wearing purple shoes that match the suspects shows seen on the security video of shooting (https://www.facebook.com/guap.prince.5). On 8/29/20 at 2:36 hrs posted on the same page was a picture of Shaurice standing at the corner of W 17th and Poplar with the caption "Pussy's said they looking for me I ain't never hiding. This is one day prior to Lopez's 2018 Mitsubishi getting shot at that location on 8/30/20.

On 10/8/20 at 10:49 hrs this Affiant interviewed Shaurice Clark in the Erie Police Major Crimes Interview room. During the interview Clark was asked about the shooting at W 19th and Poplar St. … at 19:00 hrs. Clark stated that he was not there and had just missed the shooting. I then asked about this incident at W 16th and Poplar St. Clark stated that he did not wish to talk about this incident. The interview ended.

After the interview I advised Shaurice that he would be charged …. Shaurice was then booked at the Erie Police Department.

At approximately 13:30 hrs Ptlm Post and I went cell A1 where Shaurice was waiting arraignment. … I advised Clark that I wanted to take pictures of his tattoos. He then immediately stated that he had pictures on his phone of his child's birthday party that he

- 20 -

was at. Clark then stated that these pictures were timed stamped and would prove that he was not there. At this time Shaurice would not consent to a search of his phone.

Clark's black iPhone was tagged property #6 in evidence.

It is known to this Affaint that pictures are taken at special events. It is also known to this Affiant that pictures taken with an iPhone contains metadata that gives time stamps and locations.

Based on this information, this Affiant requesting a search warrant to obtain a search of and Forensic Extraction for all call logs/records, both incoming and outgoing, all electronically or digitally stored & saved data files, photographs, videos, voice mails, IMEI number, text, applications and their data, cloud based info, social media contacts, phone contacts, phone files, Apple ID, e-mail or information contained or accessible through the use of his electronic cell phone. Internal and external memory data. Contracted service to include but not limited to "text messages", "Voice Messages", "Digital Photos" sent and received, currently stored or access through the use of electronic device or cell phone from Clark's black iPhone.

Affidavit of Probable Cause, 10/15/20, at 2.

We conclude that, even if the Commonwealth established probable cause to search Appellant's phone, the warrant was so overbroad that suppression was warranted. These concepts are related, and we thus discuss them together.

Recently, in **Commonwealth v. Ani**, 293 A.3d 704 (Pa. Super. 2023), we held that the Commonwealth failed to establish probable cause to search Ani's phone "for the vast majority of items requested." **Id.** at 707. The Commonwealth suspected Ani of a series of home invasion crimes, and one of the victims observed Ani using his cell phone's flashlight in her apartment, while in another incident, Ani appeared to use his phone to send a text message. The Commonwealth prepared multiple search warrants for his

phone and its digital backups. The Commonwealth requested to search the phone for, *inter alia*, "any applications requiring the use of the phone's keyboard, including text, photo, or video message applications, Internet browsers, and applications for voice or video calls[.]" *Id.* at 709 (quoting warrant application). We concluded that "there was no probable cause to believe that the phone would contain actual evidence of the crimes," as there was no basis to conclude that Ani would have taken "trophy" photographs or videos during the commission of his crimes, and nothing suggested that he used the phone as part of the crimes. *Id.* at 723. We elaborated on this point as follows:

> The fact that [Ani] was seen using his cell phone establishes little more than his using his phone. The *Riley* [*v. California*, 573 U.S. 373 (2014),] decision declined to extend the search incident to arrest exception to the warrant requirement to smartphones largely because smartphones are so integral to daily life, a phenomenon that has only accelerated in the eight years since *Riley*. Thus, it is quite easy to conjure up reasons why a phone might contain evidence of a crime. "It would be a particularly inexperienced or unimaginative law enforcement officer who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone." [*Id.*] at 399[.] *Riley* would amount to a mere paperwork requirement if the Commonwealth could obtain a warrant to search a phone based on little more than the fact that a citizen carried a phone while committing a crime. Thus, the fact that [Ani] was seen using his phone in the hallways of the victims' apartments and commented to [a witness] that he was sending a text message is of minimal value.
>
> The Commonwealth hypothesizes that [Ani] may have taken photographs or videos during the commission of these crimes. Perhaps, but that could be said of any crime, and seeks to enshrine a level of generality in place of individual circumstances, which [*Commonwealth v.*] *Jacoby*[, 170 A.3d 1065 (Pa. 2017),]

- 22 -

forbids. … [T]he notion that [Ani] took evidence of his "trophies" or videotaped his crimes rested on pure conjecture. We cannot imagine that, in the era before cell phones became a daily part of life, a court would authorize a search warrant for a home on the basis that such "trophy" photographs would likely be present in a burglary suspect's home. …

Finally, there is no indication that [Ani] was using his phone to communicate about the crimes.

*Id.* at 727-28 (some bracketing added). We ultimately concluded that the defective portions of the warrant were severable and authorized the Commonwealth to use evidence for which it established probable cause; in that case, locational data and evidence concerning the use of the phone's flashlight application.

Applying **Ani**, we conclude that the Commonwealth failed to establish probable cause to search Appellant's phone for anything. "[T]he natural starting point for this inquiry is addressing probable cause. 'Consequently, in any assessment of the validity of the description contained in a warrant, a court must initially determine for what items probable cause existed. The sufficiency of the description must then be measured against those items for which there was probable cause.'" *Id.* at 722. That legal determination must be made by examining the four corners of the affidavit. The affidavit does not establish probable cause to believe that Appellant's cell phone would contain any "items" that may be targeted by a search warrant. The key language justifying a belief that the phone would contain anything relevant to the crime of aggravated assault was due to Appellant's comment that his phone contained pictures that would give him an alibi. This does not establish

probable cause to justify a search. The proper subjects of a search warrant are dictated by rule.

A search warrant may be issued to search for and to seize:

(1) contraband, the fruits of a crime, or things otherwise criminally possessed; or

(2) property that is or has been used as the means of committing a criminal offense; or

(3) property that constitutes evidence of the commission of a criminal offense.

Pa.R.Crim.P. 201.

The first two possibilities are not implicated, leaving the third. The trial court determined that this warrant established sufficient probable cause because authorities were permitted to search for exculpatory information. It opined:

As the warrant obtained on October 15, 2020[,] specifically indicates, [Appellant] made statements on October 8, 2020[,] when he was in custody about content/photos on his phone. Although those comments about the information/photos indicated that [the] information was potentially exculpatory, they did provide a legitimate reason to obtain the warrants so that information could be retrieved as part of the overall investigation.

Order, 9/27/21, at unnumbered 1.

The trial court did not cite any authority for this proposition, and the Commonwealth's brief does not supply one either. We conclude that the authorities were not permitted to search Appellant's phone for potentially exculpatory information. As our Supreme Court stated in *Commonwealth v.*

*Jones*, 988 A.2d 649 (Pa. 2010), search warrants may be used as an investigative tool under certain circumstances:

> The "comment" to Rule 201(3) references *Warden v. Hayden*, 387 U.S. 294 … (1967). In *Warden*, the United States Supreme Court *reversed* case law holding that only contraband and the fruits of a crime can be seized pursuant to the Fourth Amendment, but not "mere evidence." The Court determined that nothing in the Fourth Amendment supports a distinction between contraband and "mere evidence," concluding that evidence of a crime is clearly subject to search and seizure under the Fourth Amendment. The Court held that it is reasonable under the Fourth Amendment to conduct otherwise permissible searches for purpose of obtaining evidence that would aid in apprehending and convicting criminals. *Id.* at 306–07…; *see also Commonwealth v. Butler*, … 291 A.2d 89, 90 (Pa. 1972) (holding that a search and seizure may be for "purely evidentiary items" when there is a "nexus between the items to be seized and the suspected crime," citing and quoting *Warden*, *supra* at 307…).
>
> Therefore, under Rule 201(3), we recognize that a search warrant may be issued to search for and seize property that may constitute "mere evidence" concerning a crime that has been committed.

*Id.* at 658 (emphasis in original).

Searching for things that would exonerate Appellant does not fall within this possibility, as a general investigatory search is limited to evidence "concerning a crime that has been committed." *Id.* Evidence that exonerates Appellant—who had already been arrested for these crimes—is not evidence of a crime; it is evidence that he did not commit the crime. The trial court therefore erred in finding that probable cause existed. As a result, the warrant was entirely overbroad. *Commonwealth v. Johnson,* 240 A.3d 575, 586 (Pa. 2020) (OAJC) ("[W]here a search warrant issues in the total absence of

probable cause, the warrant is, quite literally in some sense, entirely 'overbroad.'").

Alternatively, even if we accept that the authorities were entitled to "rule out" Appellant by searching the phone, the warrant still fails because it is insufficiently particular when measured against that limited probable cause.

> This Court has recognized that the particularity component subsumes two distinct, although often related, concepts. The first concept addresses the degree of particularity required. A warrant that is not "particular enough" permits "a search in terms so ambiguous as to allow the executing officers to pick and choose," which amounts to the rummaging that so offended the drafters of the federal and state constitutions. **Commonwealth v. Santner**, … 454 A.2d 24, 25 n.2 (Pa. Super. 1982). This first component thus ensures that the authorities are sufficiently limited in what they can seize. The second concept is overbreadth. A warrant can be clear in terms of what will be seized, thus ensuring that the authorities' discretion does not permit a general rummaging. But if the warrant allows authorities to seize items for which probable cause does not exist, it may be overbroad.

**Ani**, 293 A.3d at 716.

With respect to the degree of particularity, the warrant did not include any kind of temporal limitation. While we disagree with the conclusion that the authorities were permitted to search for exculpatory information, even under that theory the Commonwealth knew exactly when the crime occurred. Warrants must contain temporal limitations when possible in order to ensure that the warrant does not authorize a general rummaging. On this point, the **Ani** Court discussed **Commonwealth v. Green,** 265 A.3d 541 (Pa. 2021), in which our Supreme Court held that the warrant involved need not include a temporal limitation with respect to a search for child pornography on digital

devices. We explained why *Green* cannot be read to hold that a temporal limitation is never required when searching a digital device:

> Additionally, it is quite difficult to separate the probable cause resolution in *Green* from its analysis of the overbreadth question. In rejecting *Green's* argument that the probable cause was limited to the particular child pornography image downloaded, the *Green* Court pointed out that the target of the investigation was "sharing a collection of child pornography in general, which is exactly what the warrant permitted the officers to search for and seize." *Green*, 265 A.3d at 554. Thus, the "item" for which there was probable cause was a collection of child pornography, which could be anywhere on the device. In that context, a temporal limitation makes little sense as the Court's probable cause calculus did not consider a crime occurring over a particular period of time. Thus, nothing in *Green* suggests that a temporal requirement will never be required. If a temporal limitation is "reasonably possible," then [*Commonwealth v.*] *Grossman*[, 555 A.2d 896 (Pa. 1989),] demands its inclusion.

*Ani*, 293 A.3d at 723.

The Commonwealth knew from surveillance videos and police responses exactly when the crime occurred. Yet, nothing in the warrant limited the authorities to a certain day, let alone a timeframe encompassing the shooting. Thus, even if we accept that the Commonwealth was entitled to look for evidence that would tend to exonerate Appellant, any such search would have to be temporally limited. Accordingly, the search warrant is overbroad as it permitted the authorities to rummage.[9]

---

[9] As to whether the warrant was insufficiently particular in the sense it allowed the authorities to search beyond photographs, we acknowledge that limiting the Commonwealth to specific "categories" of information poses doctrinal difficulties given the ease with which information can be hidden in devices like a smartphone. *See generally Ani*, 293 A.3d at 722-23.

Turning to the second warrant, many of the defects identified *supra* apply to this warrant, as well. The second warrant was served on Facebook, targeting three Facebook accounts. Two of the accounts belonged to Appellant ("Dupree Clark" and "Guap Prince"). The third account belonged to Savannah Lopez. The warrant sought to obtain the following:

> Any and all Facebook account information to include user contact information, including full name, user identification number, birth date, contact e-mail addresses, physical address (including city, state and zip code), telephone numbers, screen names, websites, and any other personal identifiers and group identification numbers, a list of current registered users to the group and group contact info, including all contact information for the creator and/or administrator of the group and a .pdf file of the current status of the group profile page. All photo prints, including all photos uploaded by that user I.D. and all photos uploaded by any user that have that user tagged in them. All Neoprints, including profile contact information, Mini-Feed information, status updates, links to videos, videos, photographs, articles, and other items. Notes. Wall postings. Friends lists, including the friends Facebook user identification numbers. Groups and networks of which the user is a member, including the groups Facebook group identification numbers. Future and past event posting. Rejected Friend requests. Comments, gifts, pokes, tags and information about the users access and use of Facebook applications. All other communications and messages made or received by the user, including all private messages and pending Friend requests. All IP logs, including all records of the IP addresses that logged into the account. All information about the user's access and use of Facebook Marketplace. The length of service (including start date), the types of service utilized by the user and the means and source of payment associated with the service (including any credit card or bank account number). All privacy settings and other account settings. All recordings pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of action taken.

Application for Search Warrant, 10/21/20, at 1-2.

The affidavit of probable cause discussed Facebook in general and largely reproduced everything from the first warrant. The only additional pertinent information is the following paragraph added at the end:

Based on the experience and training of these Affiants, it is not uncommon for people involved in criminal activity to use social media prior to and after the commission of a crime. Individuals may communicate on social media, specifically Facebook, through the use of sending instant messages, Facebook audio and video messages.

Affidavit of Probable Cause, 10/21/20, at 2.

We conclude that this warrant is overbroad because it too fails to include any kind of temporal or categorical limitation. We find persuasive the decision in *United States v. Blake*, 868 F.3d 960 (11th Cir. 2017), which involved an investigation of a prostitution ring. The authorities applied for two search warrants of a Facebook account belonging to Moore, one of the two co-defendants. At the time the warrant was obtained, the authorities "had extensive evidence linking Moore to the prostitution ring…. Moore's Facebook account was suggestive of criminal conduct: the publicly viewable version of the account listed Moore's occupation as 'Boss Lady' at 'Tricks R [U]s.'" *Id.* at 966. The warrants

required Facebook to "disclose" to the government virtually every type of data that could be located in a Facebook account, including every private instant message Moore had ever sent or received, every IP address she had ever logged in from, every photograph she had ever uploaded or been "tagged" in, every private or public group she had ever been a member of, every search on the website she had ever conducted, and every purchase she had ever made through "Facebook Marketplace," as well as her entire contact list. The disclosures were not limited to data from the

period of time during which Moore managed the prostitution ring; one warrant asked for all data "from the period of the creation of the account" and the other did not specify what period of time was requested. The warrants did state that the only information that would be "seized," after all that data had been "disclosed" to the FBI, was data that "constitute[d] fruits, evidence and instrumentalities" of a specified crime.

*Id.* at 966–67 (footnote omitted).

The **Blake** Court did not decide whether the warrant was overbroad because it applied the "good faith exception" to the exclusionary rule, which does not apply in this Commonwealth. **Commonwealth v. Edmunds,** 586 A.2d 887 (Pa. 1991). Its discussion, however, suggests that the warrants were overbroad:

The Facebook warrants are another matter. They required disclosure to the government of virtually every kind of data that could be found in a social media account. And unnecessarily so. With respect to private instant messages, for example, the warrants could have limited the request to messages sent to or from persons suspected at that time of being prostitutes or customers. And the warrants should have requested data only from the period of time during which Moore was suspected of taking part in the prostitution conspiracy. Disclosures consistent with those limitations might then have provided probable cause for a broader, although still targeted, search of Moore's Facebook account. That procedure would have undermined any claim that the Facebook warrants were the internet-era version of a "general warrant."

**Blake**, 868 F.3d at 974 (citations omitted).

We recognized in **Ani** that searches of digital evidence is still a developing area of the law, especially with respect to *ex ante* restrictions on "where" authorities may search. However, the foregoing suggests that the need for an extensive search is not as prevalent in the Facebook context

because "when it comes to Facebook account searches, the government need only send a request with the specific data sought and Facebook will respond with precisely that data." *Id.* Here, the foregoing discussion from *Blake* is persuasive, and is fully consistent with *Ani*. The Commonwealth sought the complete contents of these Facebook accounts instead of limiting it temporally. Furthermore, the warrant purported to establish probable cause to search for communications between Appellant and other unspecified individuals. While we do not express any opinion on whether probable cause existed to do so, the Commonwealth easily could have requested to obtain only direct messages during the relevant timespan. Instead, it chose to obtain virtually everything that Facebook captures. We therefore conclude that the Facebook warrants are overbroad.

## VI.

However, we cannot decide the remedy based on this record. While we may apply harmless error *sua sponte*, we are not presently convinced that the error was harmless beyond a reasonable doubt. *See Commonwealth v. Hamlett*, 234 A.3d 486, 488 (Pa. 2020). While the Commonwealth presented DNA evidence and video surveillance showing the perpetrator pursuing the black BMW, the Commonwealth's own filings reflect uncertainty that identification was guaranteed based solely on that evidence. The Facebook images constituted powerful corroborating evidence, and we are not presently inclined to *sua sponte* declare at this juncture, without the benefit of advocacy from both parties, that the error was harmless beyond a reasonable doubt.

That aside, the more pressing problem is that the record does not indicate what evidence the Commonwealth obtained from these search warrants. Thus, we cannot even determine what evidence should have been suppressed. As we previously noted, the application for the first warrant referenced that the Commonwealth possessed photographs obtained from Facebook, including a photograph depicting Appellant in purple shoes. The Commonwealth may have obtained this information from publicly-accessible portions of Facebook. The test set forth in **Katz v. United States**, 389 U.S. 347, 351 (1967), states, "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." We have not discovered any precedential decision from this Court applying that principle to social media accounts, but other jurisdictions have grappled with the reasonable expectation of privacy in Facebook postings, including associated questions of whether the government can become "false friends" with the target. **Compare Everett v. State**, 186 A.3d 1224, 1236 (Del. 2018) ("We resolve the case on narrow grounds—namely, that the Fourth Amendment does not guard against the risk that the person from whom one accepts a 'friend request' and to whom one voluntary disclosed such information might turn out to be an undercover officer or a 'false friend.'") **with Commonwealth v. Carrasquillo**, 179 N.E.3d 1104, 1120 (Mass. 2022) ("[A]lthough an individual's choice to share social media content with others diminishes the individual's privacy interests, it does not *per se* defeat them."). We need not extensively survey the cases on this point. We observe only that

the record does not indicate which of the Commonwealth's trial exhibits, if any, are traceable to the execution of these warrants, nor does it indicate which photographs existed when the Commonwealth applied for the warrant and how the Commonwealth obtained those items.

Accordingly, we direct the trial court to hold a hearing within 30 days of the date the record is remitted to determine (a) how the Commonwealth obtained the Facebook photographs cited in the warrant applications; and (b) what evidence, if any, was introduced at trial due to the execution of these invalid warrants. This Court retains the option to require the parties to brief harmless error upon return of the record. *Hamlett, supra* at 494 ("[W]hen an appellate court deems it appropriate to exercise its discretion to undertake a harmless error analysis of its own accord in close cases, it has the ability to enhance fairness to the defendant and facilitate its own review by directing that there be supplemental briefing.").

Case remanded for further proceedings. Panel jurisdiction retained.